**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
01/12/2015**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DIGERATI TECHNOLOGIES, INC.,** | § | **CASE NO. 13-33264-H4-11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |
| | § | |
| | § | |

**MEMORANDUM OPINION REGARDING FINAL FEE APPLICATION OF DEBTOR'S
INVESTMENT BANKER GILBERT A. HERRERA AND HERRERA PARTNERS FOR
ALLOWANCE OF COMPENSATION FOR SERVICES AND REIMBURSEMENT OF
EXPENSES FOR THE PERIOD BEGINNING JULY 1, 2013 THROUGH APRIL 4, 2014**
[Doc. No. 826]

## I.    Introduction

This Memorandum Opinion concerns a subject that is near and dear to the heart of any professional who provides services to a bankruptcy estate: compensation.  In this particular case, the message is that what a professional tells the Court—or fails to tell the Court—in connection with the original application to employ can come back to haunt the professional at the fee application hearing.

Before the Court are the following: (1) the Final Fee Application of Debtor's Investment Banker Gilbert A. Herrera and Herrera Partners for Allowance of Compensation for Services and Reimbursement of Expenses for the Period Beginning July 1, 2013 through April 4, 2014 (the Final Application) [Doc. No. 826], with the fee request in the amount of $476,245 and the request for reimbursement of expenses in the amount of $7,726.81; (2) the Objection to Final Application of Debtor's Investment Banker Gilbert A. Herrera and Herrera Partners [Doc. No. 850]; (3) Secured Creditors' Terry Dishon, Hurley Fairview, LLC and Sheyenne Rae Nelson Hurley's Objection to Final Fee Application of Debtor's Investment Banker Gilbert A. Herrera

and Herrera Partners for Allowance of Compensation for Services and Reimbursement of Expenses for the Period Beginning July 1, 2013 through April 4, 2014 [Doc. No. 860]; (4) the Memorandum Concerning Void Status of Herrera Partners' Contract with Debtor (the Objecting Parties' Memorandum) [Doc. No. 1010]; and (5) the Memorandum Addressing Lack of Necessity for Herrera Partners to Have Been Licensed as a Broker-Dealer to Provide the Services Rendered Pursuant to the Court-Approved Engagement Letters (the Reply Memorandum) [Doc. No. 1041]. This Court held hearings on the Final Application on May 27, July 22, August 18, August 20, September 9, October 1, October 14, and November 7, 2014. The Court then took the matter under advisement.

After considering the pleadings referenced above, the exhibits introduced by the parties, the testimony adduced at the hearings, and the closing arguments of counsel, the Court finds that the Final Application should be denied in its entirety. This Opinion, which contains findings of fact and conclusions of law made pursuant to Bankruptcy Rules 7052 and 9014, explains the Court's ruling.

## II.    Findings of Fact

Digerati Technologies, Inc. (the Debtor), at the time of its Chapter 11 filing on May 30, 2013, was a publicly held company whose primary assets were 100% stock ownership of two oilfield services companies that the Debtor valued at $30 million each: Hurley Enterprises, Inc. (Hurley) and Dishon Disposal, Inc. (Dishon). [Doc. No. 51]; [App. to Employ Hr'g Tr. 6:22, July 10, 2013]. Gilbert Herrera (Herrera) and his firm, Herrera Partners (HP), were hired in connection with the Debtor's attempt to sell these two companies. In the Final Application, HP requests $476,245 for services performed between July 1, 2013 and April 4, 2014, plus

reimbursement of $7,726.81 in expenses.  A Joint Plan of Reorganization for the Debtor was confirmed on April 4, 2014. [Doc. No. 795].

The Application to Employ Gilbert A. Herrera and Herrera Partners as Investment Banker and Request for Expedited Consideration (the Application to Employ) [Doc. No. 68] was filed by Debtor's Counsel, Hoover Slovacek LLP (Hoover Slovacek), on July 1, 2013.  A hearing on the Application to Employ was held on July 10, 2013, and the Application was approved on July 12, 2013 [Doc. No. 68].  The purpose of HP's engagement was to assist the Debtor in the sale of the Dishon and Hurley subsidiaries, which was the overriding goal of the Debtor and necessarily the basis of any plan in this case.  [*See* App. to Employ Hr'g Tr. 5:25–6:6.].  Not only were Dishon and Hurley the only significant assets the Debtor owned, but it was the purchase of these subsidiaries that had thrust the Debtor into bankruptcy in the first place.  *Id.* at 5:20–22.  The Debtor had purchased these subsidiaries through a reverse merger in which the owners of Hurley (the Hurleys) and the owner of Dishon (Terry Dishon) received promissory notes secured by the stock of their businesses.  [Doc. No. 68, ¶7]; [Doc. No. 768 at 25–26]. Unable to raise the capital to pay off the notes, the Debtor entered bankruptcy with over 96% of its liabilities owed to the Hurleys and Terry Dishon ($30 million to each). [Doc. 41, p. 1, 10].

Ultimately, the subsidiaries sold for approximately $41 million, about two-thirds of the amount the Debtor owed on the Hurley and Dishon notes.  [*Id.*].  Dishon was sold to Buckhorn Disposal, LLC (Buckhorn) at auction on June 19, 2014 for $27,000,000.  [Doc. No. 910].  The only other bidder was Terry Dishon with a credit bid of $12,250,000.  [Doc. No. 910].  The Hurleys submitted the winning bid for Hurley at auction, with a credit bid of $14 million. [Doc. No. 929].

III.    **Credibility of Witnesses**

1.  Two individuals testified at the hearings on the Final Application: (1) Herrera; and (2) Vess Hurley.

2.  Herrera was an evasive witness who frequently had difficulty giving forthright answers to the questions posed to him.  He often hedged his answers to straightforward questions with phrases such as "Not that I am aware of."  [*See, e.g.*, Hearing of July 22, 2014, at 1:41 p.m.].  Herrera also contradicted himself on certain issues.  For example, he initially testified that the time entries in the Final Application were contemporaneous, but later admitted that the entries were revised months later.  [Hearing of August 18, 2014, at 1:42–1:48 p.m.].  Further, Herrera was often unable to provide detail substantiating his claims.  For example, he testified that he met with potential purchasers in Dallas, but was unable to name any specific potential purchasers with which he met.  [Hearing of August 20, 2014 at 9:16–26 a.m.].  Overall, this Court finds Herrera's testimony less than entirely credible; therefore, the Court gives only some weight to his testimony.

3.  Vess Hurley answered the questions posed to him forthrightly, even to the point of being brutally blunt.  The Court finds him to be a very credible witness and gives substantial weight to his testimony.

IV.    **Conclusions of Law**

A.    **Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  The district courts may, in turn, refer "any or all proceedings arising under

4

title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." § 157(a); and, in the Southern District of Texas, General Order 2005–6 (entitled General Order of Reference) automatically refers all cases and adversary proceedings to the bankruptcy court.  Furthermore, this particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), and (O).

Venue is proper pursuant to this Court's ruling of September 30, 2013 and associated Findings of Fact and Conclusions of Law.  [Doc. Nos. 318 & 319].

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), this Court must also evaluate whether it has the constitutional authority to enter a final order adjudicating the dispute at bar.   In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based on state common law and does not affect the claims adjudication process. *Id.* at 2616.

The dispute at bar is not a counterclaim of the Debtor, nor does it arise out of state law. Rather, the dispute at bar arises out of objections to a claim against the estate, i.e. a fee application of a professional retained by the estate.  The relief sought is entirely based upon § 330, which allows the Court to award or deny compensation to a professional providing services to the debtor's estate.  State law has no equivalent to this statute; it is purely a creature of the Bankruptcy Code.  Accordingly, because the dispute at bar involves resolution of a claim against the estate, and because the resolution of this claim dispute is not based solely on state common

law, but rather is based upon a provision of the Bankruptcy Code, this Court has the constitutional authority to enter a final order pursuant to 28 U.S.C. §§ 157(a) and (b)(1).

### B. Summary of Conclusions regarding the Final Application

The Court finds that the Final Application should be denied for the following reasons: (1) HP has failed to meet its evidentiary burden of proving the services performed; (2) HP's services did not result in an "identifiable, tangible, and material benefit to the bankruptcy estate" as required to be compensable in the Fifth Circuit; and (3) HP's services were not reasonably likely to benefit the estate when performed. Finally, pursuant to the wide discretion that this Court has in ruling on fee applications, the Court denies the Final Application because, in addition to the above defects, HP failed to make disclosures required by the Bankruptcy Rules.[1]

Section 327 of the Bankruptcy Code[2] provides for employment of professionals by a trustee or debtor-in-possession:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). When applying for employment with a bankruptcy estate, a professional must disclose all possible conflicts of interest. Fed. R. Bankr. P. 2014. Compensation for bankruptcy professionals is governed by § 330, under which "the [bankruptcy] court may award to . . . a professional person employed under section 327 . . . reasonable compensation for actual, necessary services rendered by the . . . professional person." 11 U.S.C. § 330. Section 330 specifies that "the court shall not allow compensation for . . . services that were not . . . reasonably likely to benefit the debtor's estate." *Id.*

---

[1] The Federal Rules of Bankruptcy Procedure (the Rules)
[2] Title 11 of the United States Code (the Code).

6

The applicant bears the burden of proof in a fee application case. *Matter of Evangeline Ref. Co.*, 890 F.2d 1312, 1326 (5th Cir. 1989).  In the Fifth Circuit, an applicant must satisfy a retrospective test, establishing that its services "resulted in an identifiable, tangible, and material benefit to the bankruptcy estate." *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998).  Under the more lenient majority approach favored in a majority of circuits,[3] applicants need only meet a prospective test, showing that "the services were objectively beneficial toward the completion of the case at the time they were performed." *Id.*

Pursuant to the Rules, an applicant seeking compensation must introduce detailed, substantiated time records. Fed. R. Bankr. P. 2016.  A court may deny a fee application in its entirety if time records are inadequate to establish the services performed. *In re DiLieto*, 468 B.R. 510, 528 (Bankr. D. Conn. 2012).  A court may also deny, in whole or in part, a fee application if it discovers the applicant failed to make the conflict disclosures required by Rule 2014. *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465–66 (5th Cir. 2012); *In re W. Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005).

In the case at bar, the Court finds that the Final Application should be denied for the following reasons: (1) HP has failed to supply sufficiently detailed, accurate records to prove the services performed; (2) HP's services related to the Hurley and Dishon sales did not result in an "identifiable, tangible, and material benefit to the bankruptcy estate," or, alternatively, were not

---

[3] *See In re Smith,* 317 F.3d 918, 926 (9th Cir. 2002) ("[S]ervices that are reasonably likely to provide an identifiable, tangible and material benefit to the debtor's estate can be compensated, even if they do not actually provide such a benefit." ); *In re Top Grade Sausage, Inc.,* 227 F.3d 123, 132 (3d Cir. 2000) *abrogated on other grounds by Lamie,* 540 U.S. 526, 124 S.Ct. 1023 (adopting the test that the professional's services "be evaluated pursuant to the standards set forth in § 330(a)(4)(A) and not by some heightened standard or by hindsight. Accordingly, the debtor's attorney must show that the representation was reasonably likely to benefit the debtor' estate."); *In re Ames Department Stores, Inc.,* 76 F.3d 66, 72 (2d Cir. 1996) (holding that if a professional's services "are reasonably likely to benefit the debtor's estate, they should be compensable"); *In re Taxman Clothing Co.,* 49 F.3d 310, 314 (7th Cir. 1995) (adopting the standard of whether the services were those of a reasonable professional).

likely to benefit the estate at the time they were performed; and (3) HP failed to disclose a connection with Debtor's counsel, in violation of Rule 2014.

### C. The Final Application is fatally flawed by HP's failure to keep detailed, contemporaneous records of each individual activity.

The Final Application does not merit approval because HP's records are not detailed or sufficiently trustworthy to enable this Court to determine reasonable compensation. The Final Application is deficient in three regards: (1) the time entries are unreliable because they were not kept contemporaneously with the services rendered; (2) the time entries do not satisfy the Rules' requirement that services be documented in detail; and (3) the time entries lump distinct activities together. Due to these pervasive deficiencies, HP has failed to prove that any of its services were actual, necessary and reasonable. Therefore, this Court denies the Fee Application in full.

#### 1.  The time entries are not contemporaneous with the services rendered.

The U.S. Trustee Guidelines for Reviewing Applications for Compensation (UST Guidelines) provide guidance on the level of detail required for a sufficient fee application, instructing that "[t]ime entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour." 28 C.F.R. Pt. 58, App. A. Without contemporaneous time records, courts are unable to ensure the accuracy of a professional's application. *In re DiLieto*, 468 B.R. 510, 528 (Bankr. D. Conn. 2012). While a lack of contemporaneous time records does not result in *per se* denial of a fee application in the Fifth Circuit, it may result in partial or full denial if it rises to the level of the professional not meeting his or her burden of proof. *See Evangeline*, 890 F.2d at 1327 (stating that a professional who submits non-contemporaneous records should only be awarded fees "*to the level* that has been proven to be actual, necessary and reasonable") (emphasis in original).

8

This Court finds that HP's time entries are not contemporaneous, and for that reason are not reliable and have very limited evidentiary value in proving that HP's services were actual, necessary, and reasonable. Though Herrera initially testified that the time entries in the Final Application were contemporaneous, [Hearing of August 18, 2014, at 1:42 p.m.], this testimony is contradicted by his subsequent admission that the entries were revised months later, [Hearing of August 18, 2014, at 1:48 p.m.]. The Court received its first opportunity to review HP's time sheets when HP filed its Interim Application for Compensation of January 13, 2014. [Doc. Nos. 669 & 670] (the Interim Application).[4] Herrera testified that he made changes to the time entries from the Interim Application on the Final Application to account for "updates" and "matters brought to [the firm's] attention." [Hearing of August 18, 2014, at 1:48 p.m.]. A comparison of the Interim Application and the Final Application reveals different monthly totals for every month included (January through December 2013). [Secured Creditors' Ex. 3, pp. 5–6]; [Doc. No. 826, p. 6–7]. When questioned about specific changes to time entries—for example, a reduction of "Document review (pleadings, entities, company background)" from 2 to 1.9 hours—Herrera's only explanation was that at the time of revision the firm had "better knowledge." [Hearing of August 18, 2014, at 2:04–2:10 p.m.]; [Secured Creditors' Ex. 3, p. 40]; [Doc. No. 826-1, p. 15]. The numerous unexplained discrepancies between the Interim Application and the Final Application cast doubt on the overall accuracy of HP's time records.

Adding to this doubt is the fact that time entries in the Final Application citing conversations with Debtor's counsel are not substantiated by the time entries submitted by Debtor's counsel, Hoover Slovacek. In January of 2014, for example, HP and Hoover Slovacek for the most part did not even bill conferences with each other on the same days: HP has conferences billed on the 2nd, 3rd, 6th, 21st, 30th, and 31st, while Hoover Slovacek billed for

---

[4] HP filed the Interim Application at 2:23 p.m., and then approximately 90 minutes later filed an amended version.

conferences on the 9th, 13th, 23rd, 27th, and 29th. [Doc. No. 826-1, pp. 79, 80, 87, 94, & 95]; [Secured Creditors' Ex. 7, pp. 339, 378, & 465–69]. When the dates do match up, the amount of time almost never does. On only one day do the entries mostly coincide: on January 8, 2014, HP billed .6 hours for "Discussion with Debtor and Debtor's counsel regarding Bid Instruction Letter," and Hoover Slovacek billed .6 hours total for two teleconferences with Herrera and Biggerstaff regarding the Dishon and Hurley sales. [Doc. No. 826-1, p 80]; [Secured Creditors' Ex. 7, p. 465–66.]. This corroboration is undermined somewhat, however, by HP's billing 1.2 hours for "Updates to Dishon buyer candidate list, follow up with outstanding NDAs and discussions with Debtor's counsel," which corresponds in Hoover Slovacek's records only to a .3 hour-entry for "Phone conference and email with Mr. Herrera regarding revisions to fee application." [Doc. No. 826-1, p 81]; [Secured Creditors' Ex. 7, p. 339].

Generally, HP billed more time for conference calls with Hoover Slovacek than vice versa. For example, on January 15, 2014, HP billed 1.4 hours for discussions with Hoover Slovacek, while Hoover Slovacek only billed .4 hours for discussions with HP. [Doc. No. 826-1, p 83]; [Secured Creditors' Ex. 7, p. 466–67]. On the 20th, the gap is still greater, with HP billing 2.1 hours for discussions with Hoover Slovacek and Hoover Slovacek billing only .5 hours for presumably the same discussions. [Doc. No. 826-1, pp. 86–87]; [Secured Creditors' Ex. 7, p. 467]. However, on January 7, Hoover Slovacek billed more, charging .8 hours for "Telephone conference with G. Herrera to discuss process for requesting letters of intent from potential buyers" while HP billed .3 hours for "Discussion with Debtor and Debtor's counsel regarding Bid Instruction Letter." [Doc. No. 826-1, p. 80]; [Secured Creditors' Ex. 7, p. 465].

Although the Court recognizes that some variation may be explainable by, for example, a difference in the scope of HP's and Hoover Slovacek's services, it finds that the discrepancies in

the instant case are pervasive and reflect either error on HP's or Hoover Slovacek's part. As such, these discrepancies further erode this Court's confidence in the accuracy of HP's time entries.

### 2. The time entries are not sufficiently detailed.

Rule 2016 sets forth the requirements for applications for compensation for bankruptcy professionals. Pursuant to this rule, "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Fed. R. Bankr. P. 2016. The UST Guidelines further provide that: "Time entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication. Time entries for court hearings and conferences should identify the subject of the hearing or conference."

In the instant case, the Court concludes that the Final Application is not sufficiently detailed and accurate to support a determination of which activities are compensable. Many entries are overly general. For example, between August 12 and October 7, 2013, HP billed the estate a total of $13,510 for 38.6 hours of "Discussion with Debtor and Debtor's counsel regarding sales process, due diligence process and gathering available documents."[5] This description of services does not satisfy the UST Guidelines' instruction that "Services should be noted in detail" and that "Time entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication." HP does not identify the persons with whom its employees were speaking, and the nature of the communication is almost so broad as to encompass the entire scope of services HP was hired to

---

[5] This calculation does not account for additional hours billed for the very similar "Discussion with Debtor and Debtor's counsel regarding due diligence process and gathering available documents."

11

perform.    As with the contemporaneity requirement, without detailed time entries, it is impossible for this Court to determine whether HP's services benefitted or were likely to benefit the estate.  *See Evangeline*, 890 F.2d at 1327 (noting that courts must enforce the requirement that professionals provide a "sufficiently detailed and accurate" record to establish the services rendered, or the applicant's burden of proof would be "a mere shell.").

### 3. Time entries contain separate and distinct activities impermissibly "lumped" together.

The UST Guidelines also provide that "[s]ervices should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimis amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate."  The requirement that records be separated into individual activities and not "lumped" enables the bankruptcy court to accurately assess whether each task merits compensation from the estate.  *In re DiLieto*, 468 B.R. at 530. "'Lumping' makes it difficult for a court and parties in interest to determine if the amount of time spent on a particular activity was reasonable and valuable to the estate."  *Id.*  Consequently, courts frequently reduce fees by a flat percentage when confronted with lumping.  *See, e.g., In re Energy Partners, Ltd.*, 422 B.R. 68, 89 (Bankr. S.D. Tex. 2009); *In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005).  Alternatively, a court may deny compensation for all "lumped" time entries.  *In re DiLieto*, 468 B.R. at 530.

Lumping is pervasive throughout the Final Application.  To highlight a few examples:

- On November 21, 2013, Biggerstaff billed 1.4 hours for "Develop target candidate list, search contact information, evaluate strategic fit with Dishon; related discussions regarding potential Dishon buyers. [Doc. No. 826-1, p. 60].
- On November 23, 2014, Biggerstaff billed 7.3 hours for "CIM [Confidential Information Memorandum] drafting, analysis, research and editing changes regarding capacity, updated financial statement presentation and customer data; charts and tables."  [*Id.* p. 61].

- On December 4, 2013, Herrera billed 2.2 hours for "Discussions with Dishon buyer candidates, respond to requests for NDA, review proposed changes to NDA and discussions with Debtor's counsel. [*Id.* p. 66].
- On January 16, 2014, Biggerstaff billed 1.2 hours for "Call with Dishon first and then Dishon and Howard Trussell to discuss agenda items for management presentation, preparation items to be done and structure of meetings." and 2.1 hours for "Calls with the Debtor and Merrill Corp. to arrange for establishing DataSite. Questions regarding payment, structure of data room and initial set-up." [*Id.* p. 84].
- On the same day, Herrera billed 1 hour for "Discussion and follow-up with various candidates regarding Bid Instruction Letter, due diligence process and preparations for site visits; including pending Feb 20th deadline to respond." [*Id.*].
- On January 21, 2014, Biggerstaff billed 6.7 hours for "Finalize folder structure and files to be included on DataSite, multiple calls with Merrill DataSite regarding access, security and invitations. Upload over 500 document files to DataSite. Test security and access to docs. Calls and emails regarding payment for DataSite with client and Merrill." [*Id.* p. 87].
- On February 3, 2014, Biggerstaff billed 5.1 hours for "Flight from IAH to Williston, ND including (i) review of Dishon management presentation materials and preparation for responses to key economic, capacity and competitive threat inquiries by bidder and (ii) preparation for Hurley due diligence meeting questions to be asked re financials, operations, assets, competition, etc." [*Id.* p. 17].
- On April 4, 2014, Biggerstaff billed 2.2 hours for "Develop contact data; call with SC and respond to IQ&A." [*Id.* p. 147].

In all of these examples, the inclusion of distinct activities within the same time entry makes it impossible for this Court to assess whether the time HP spent providing each distinct service was reasonable.

In sum, the Final Application is rife with time entries that lump activities, were not recorded contemporaneously, do not provide a sufficient level of detail about services performed, or are otherwise suspect. This Court is not required to sift through the voluminous record to determine the amount of compensable work performed by HP, nor does the Court believe such a task is possible in this case with any degree of accuracy. As the Fifth Circuit has emphasized:

> The reviewing court should not venture guesses nor undertake extensive investigation to justify a fee for [a professional] who has not done so himself. It is not an overly burdensome task to enlighten the court as to the work undertaken. Moreover, since every dollar received by the applicant results in one dollar less for creditors, justification for compensation is a necessity.

*Matter of Evangeline Ref. Co.*, 890 F.2d at 1326. Considering the overall unreliability and generality of the time entries in the Final Application, this Court finds that HP has wholly failed to meet its burden of proving the services rendered. Therefore, this Court denies all requested compensation.

### D. The Final Application should be denied because the services rendered by HP did not result in "an identifiable, tangible, and material benefit to the bankruptcy estate."

Under binding Fifth Circuit precedent, a bankruptcy professional's services are only compensable if they actually result in "an identifiable, tangible, and material benefit to the bankruptcy estate." *Pro-Snax*, 157 F.3d at 426. *Pro-Snax* involved the allowable compensation for debtor's counsel's work on a Chapter 11 plan that was ultimately not confirmed. *Id.* at 416–17. The Fifth Circuit remanded the matter for consideration under the strict "identifiable, tangible, and material benefit" test, instructing the bankruptcy court "to consider strongly the debtor's lack of success in obtaining confirmation of the Chapter 11 plan." *Id.* at 426.

*Pro-Snax* is integrated with the text of § 330 through a two-step inquiry. *In re Yazoo Pipeline Co., L.P.*, 2012 WL 6682025, at *11 (S.D. Tex. Dec. 21, 2012) (affirming the bankruptcy court's two-step analysis); *see also In re Cyrus II P'ship*, No. 05-39857, 2009 WL 2855725, at *5 (Bankr. S.D. Tex. Sept. 1, 2009). First, the bankruptcy court must determine whether the services were "necessary" by determining whether they provided an identifiable, tangible, and material benefit to the estate. *Id.* at 13. Second, the court asks whether the services appeared reasonably likely to benefit the estate at the time they were performed. *Id.* Both prongs must be met for the services to be compensable. *Id.* at 12. Like *Pro-Snax*, *Yazoo Pipeline* involved services a debtor's attorney had provided in connection with a plan that was never confirmed. *Id.* at 13. The district court affirmed the bankruptcy court's denial of

compensation for most of these services, which failed the first prong because they had only "prolonged the Chapter 11 case and depleted the estate's assets." *Id.* By contrast, the district court affirmed the allowance of three discrete categories of services which could be directly or indirectly linked to an actual material increase in the value of the estate: (1) the initial organization of the estate; (2) the settlement of disputed oil and gas leases, primarily in the debtor's favor; and (3) debtor-in-possession (DIP) financing work, when the debtor was successful in obtaining DIP financing. *Id.*

In the instant case, HP has failed to show that his firm's investment banking services directly or indirectly provided an "identifiable, tangible, and material benefit to the bankruptcy estate," so it is unnecessary to review whether the services appeared reasonable at the time performed under the *Pro-Snax* test. Instead, considering the purpose of HP's employment, its efforts are best characterized as unsuccessful and as a net financial drain on the estate. Therefore, like services wasted prosecuting a plan that had no chance of being confirmed, HP's services are not compensable under the "material benefit" prong of the § 330 analysis as interpreted in the Fifth Circuit.

HP's value to the estate must be assessed in light of the purpose and scope of HP's employment. At the hearing on the Application to Employ, Arthur L. Smith, the CEO of the Debtor, testified that "[t]he plan or intent of the bankruptcy is to market the Dishon and Hurley subsidiaries through an organized marketing process in order to . . . pay the creditor notes to the Hurleys and the Dishons of total [sic] $60 million and hopefully raise sufficient funds to pay all the other creditors in full and hopefully raise equity for the Equity Holders." App. to Employ Hr'g Tr. 5:25–6:6. Smith testified that HP was being hired to create marketing materials, perform due diligence, and solicit bidders. [Testimony of Arthur Smith, App. To Employ Hr'g

Tr. 7:11–18.]   HP's duties were more specifically outlined in two substantively identical

engagement letters, one for Hurley and one for Dishon, which provided that:

> HP will assist Digerati in (i) preparing a Confidential Information Memorandum that will
> be utilized in discussions with prospective Transaction candidates (ii) conducting certain
> industry due diligence including evaluating and analyzing [Hurley/Dishon's] financial
> statements, (iii) conducting certain industry due diligence including qualifying,
> evaluating and analyzing prospective buyers, (iv) handling contacts, confidential[i]ty
> agreements and managing discussions with prospective candidates, including assisting
> Digerati with negotiations with prospective Transaction candidates and (iv) completing
> the sale of [Hurley/Dishon].

[Secured Creditors' Ex. 1, pp. 41 – 49].   At the hearing on the Application, Herrera

himself predicted that Hurley would sell for $50 to $55 million in a relatively short time frame—

around four months.   [App. To Employ Hr'g Tr. 12:19–13:3.]   He testified that he expected

Dishon to sell for approximately $30 million, for a total expected return of $80 million.   *Id.* at

13:9–12. What is more, Smith, through a proffer by the Debtor's counsel, testified that in

comparing HP's fees to the proposals of other investment bankers, he used a $90 million figure

for calculations:

> Mr. Smith would testify he did an analysis of the costs to determine which would
> be the most reasonable fee and, . . . using the example of: if the compan[ies] sold
> for $90 million, the fees of all the other three entities would be about a million-
> eight and Mr. Herrera's fees . . . [would] come[] to like 800,000.   So it's about a
> million dollar saving to the Estate using Herrera Partners, based on his
> calculation.

*Id.* at 9:16–25.

In the end, the sales of the two subsidiaries netted roughly half of the expected $80

million return.   Moreover, while the end price for Dishon, $27 million, was at least in the

ballpark of its estimated value, the end price for Hurley was disastrous.   Vess Hurley testified

that he felt obligated to provide the "stalking horse bid" to set the floor price at auction.[6]   [App.

for Comp'n Hr'g Tr. 7:17–19, Oct. 14, 2014].   Yet, in the end, no outside bidder made any offer,

---

[6] The actual stalking horse bid was made by Hurley Fairview, LLC, an entity controlled by Vess Hurley.

16

and the Hurleys ended up credit bidding $14 million to buy back their own company. [Doc. No. 929]. Adding salt to the wound, the Hurleys also had to obtain a bank loan of $8 to $9 million in order to keep the company operating. [App. for Comp'n Hr'g Tr. 78:6–79:9].

Compared with the $80 to $90 million expected total price tag for the companies, the end result of $41 million was thus a dismal failure. Not only did the $41 million *not* pay off in entirety the Hurley and the Dishon notes, it left nothing on the table for the Debtor's more than 6,000 shareholders. Yet technically there was still a benefit to the estate—that $41 million of the Debtor's liabilities was retired. Therefore, the salient question, as required by *Pro-Snax*, is whether HP has established that its efforts materially, tangibly, and identifiably contributed to this benefit to the estate. After considering the evidence, this Court finds it utterly insufficient to establish that HP's efforts had any positive impact on the sales price of either Dishon or Hurley, let alone one great enough to justify HP's fee request of $483,971.81 (including expenses). In fact, there is evidence suggesting that HP's actions resulted in a lower price than if no investment banker had been employed.

### 1. HP's Services Provided No Material, Tangible, and Identifiable Benefit with Respect to the Sale of Dishon.

In the case of Dishon, HP's efforts did not materially affect the outcome because the ultimate buyer, Buckhorn, had offered at least $30 million to purchase Dishon *before HP's engagement*. [App. for Comp'n Hr'g Tr. 7:15–19; 40:9–15]. Therefore, the information-dispersing role of HP—providing potential buyers with a Confidential Information Memorandum, etc.—did not have had any effect on Buckhorn, as it had already been convinced of the value of Dishon several months *prior* to the bankruptcy.

Had HP succeeded in soliciting new bidders for the subsidiaries as it was hired to do, it might have procured a material benefit for the estate by forcing up the sales price for Buckhorn.

17

Instead, Buckhorn was able to purchase Dishon for a *lower* price than it originally offered because of the lack of competing bids.  Further, Herrera testified that he did not have any involvement in or effect on Terry Dishon's decision to credit-bid at the June 19, 2014 auction.  [Hearing of September 9, 2014 at 11:56 a.m.].  Therefore, HP cannot claim any credit even for keeping the Buckhorn bid from slipping to an even lower price.

Herrera asserts that HP "brought Buckhorn to the table" as Buckhorn had "dropped out two or three times along the way."  [Hearing of July 22, 2014 at 5:03 p.m.].  However, he does not offer sufficient detail to substantiate this claim.  Indeed, the evidence suggests a fraught relationship between Herrera and Buckhorn's principals.  Therefore, the evidence is equally compatible with a narrative in which Herrera *caused* Buckhorn's retreat from the process.

HP offered the following evidence of communications with Buckhorn.  First, Herrera testified that Buckhorn requested due diligence information from his firm which he provided sometime between December 2013 and May 2014.  [Hearing of July 22, 2014 at 11:58 a.m.].  Second, HP's time entries provide the following references to communications with Buckhorn:

- On January 9, 2014, Biggerstaff billed .6 hours for "Call with Cash Cameron of Quintana/Buckhorn re due diligence and process questions." [Doc. No. 826-1, p. 81].
- On February 4, 2014, Biggerstaff billed 6.2 hours for "Dishon Disposal management presentation to Buckhorn in Williston including follow-up." [*Id.* p. 96].
- February 10, 2014, Biggerstaff billed 2.3 hours for "Buckhorn due diligence questions regarding volume drop-off and recent financials.  Prepare adjusted EBITDA calculation and analyze quarterly results regarding inconsistent expense levels.  Call with Luci to review issue and prepare revised financials." [*Id.* p. 98].
- On February 18, 19, 22, and 23, 2014, Herrera billed a total of 7.2 hours for "Respond to Gary Ebel's comments about 'pulling back' being in reference to the delays in the court approved plan; lack of motivation to move forward with due diligence when the attorneys were still fighting over the plan; request for December and January's financial statements and addressing Buckhorn's lack of commitment to the process. [*Id.* pp. 101–103].
- On February 26, 2014, Biggerstaff billed 1.2 hours for "Review, discussion and research re Buckhorn's last minute due diligence questions/issues.  Find and

18

analyze Dishon's 2013 monthly P&L financial statements" and 1.6 hours for "Call with Gary Ebel/Buckhorn to review financial statement discrepancy questions and respond to status and remaining diligence required. Discuss bank statements to verify revenue." [*Id.* p. 105].

- The same day, Herrera billed 1.6 hours for "Discussion with Buckhorn Energy regarding financial reporting and proof of cash analysis including bank statements to verify revenue" and 2.4 hours for "Discussion with Buckhorn Energy regarding compliance issues, status of current permits, permitable capacity of the existing acreage, customer concentration or other operational issues, review of DataSite and the various compliance, permit, capacity, customer and other operational issues noted." [*Id.*].

- On February 27, 2014, Biggerstaff billed 2.8 hours for "Prepare summary of all Dishon bank statement deposits for the period 2012 thru Jan 2014.  Assist in preparation of response to Buckhorn's remaining due diligence requests.  Related call with Ed Rothberg to discuss." [*Id.* p. 106].

- On February 28, 2014, Biggerstaff billed .9 hours for "Analysis and discussion regarding method for invoicing customers, unbilled revenue and related discrepancy between monthly financials and volumes.   Call with Gary Ebel/Buckhorn re these issues and commitment to moving forward." [*Id.* p. 107].

Further, the record provides evidence of a tense relationship between HP and Buckhorn's principals.  Herrera testified that Buckhorn CFO Jim Casperson was "yelling" at him during a phone conference, and that he did not recall whether he said to Casperson at the auction: "For the record, I did not yell at you, you yelled at me." [Hearing of October 1, at 11:27 a.m.].  Thus, while HP's time entries are compatible with Herrera's claim that HP brought Buckhorn back to the table, they would also be compatible with a claim that HP's February 4 management presentation and February 10 due diligence *caused* Buckhorn's retreat from the process.  In accordance with the Fifth Circuit's reminder that courts "should not venture guesses nor undertake extensive investigation to justify a [professional's] fee," this Court finds that HP has not met its burden of establishing that it was responsible for a higher Buckhorn bid than otherwise would have occurred, when Buckhorn had in fact offered *more* before HP was involved, and there is some evidence of tension between HP and Buckhorn.  *See Matter of Evangeline Ref. Co.*, 890 F.2d at 1326.

19

### 2. HP's Services Provided no Material, Tangible, and Identifiable Benefit with Respect to the Sale of Hurley

In Hurley's case, it is even clearer that HP's services did not create value. Indeed, the evidence suggests that HP's involvement may have discouraged potential buyers of Hurley. HP's failure to solicit outside bidders had dire consequences for the Hurleys. Hurley ended up being purchased by credit bidders Sheyenne Rae Nelson Hurley and Hurley Fairview, LLC for $14,000,500. [Doc. No. 901-1]; [Doc. No. 929]. Considering that Herrera originally valued Hurley at $30 million, HP should easily have been able to find a buyer willing to offer more than this $14 million floor. Had HP succeeded at soliciting *any* outside bidder, the Hurleys would have had a choice to accept at least partial payment on their debt, or continue to credit bid if they felt the price still did not reflect their company's value. Instead, the Hurleys had no choice but to repossess the company and sink more money into keeping it afloat. [App. for Comp'n Hr'g Tr. 78:6–79:9].

But more than failing to solicit bidders, HP may have pushed them away. HP did not attempt to contact potential purchasers for Hurley until it had completed the Confidential Information Memorandum in April, which Herrera testified was delayed by Hurley's inadequate financial information. [Hearing of September 9, 2014 at 10:26–10:36 a.m.]. However, one candidate, Oil Patch Group, Inc., which had a prior relationship with the Hurleys, had made an offer for Hurley in February 2014. [*Id.*]; [Hearing of Oct. 1, 2014 at 3:23 p.m.]. HP's failure to pursue this interest, when HP was the established point contact for sales of the subsidiaries, could have actually discouraged Oil Patch. [*See* Testimony of Vess Hurley, App. for Comp'n Hr'g Tr. 8:19–23] (testifying that HP was supposed to market and sell Hurley). Furthermore, though post-confirmation and therefore not within the scope of the Final Application, HP's unhelpful attitude to another potential buyer, the Moudy Group, is illustrative. Sheyenne Hurley

20

had emailed Biggerstaff on May 1, 2014, asking for a PowerPoint Presentation or other information to share with the Moudy Group, which was scheduled for a site visit. *Id.* Biggerstaff declined to provide a PowerPoint because HP "ha[d] not been introduced" to the Moudy Group, and suggested the Hurleys ask the trustee. *Id.* He then stated it was still "early in the [sale] process," although it had now been nearly ten months since the firm's engagement. *Id.* In explanation for his firm's response, Herrera testified that HP didn't see the Moudy Group as a "core purchaser." [App. for Comp'n Hr'g, Aug. 20, 10:23 a.m.] Perhaps because of HP's failure to participate in these initial discussions, the Moudy Group told Vess Hurley it would not work with Herrera. [Testimony of Vess Hurley, App. for Comp'n Hr'g Tr. 19:12–19:18.].

In the end, Vess Hurley testified that HP brought no buyers to the table and was more harmful than helpful in attracting a buyer. [Testimony of Vess Hurley, App. for Comp'n Hr'g Tr. 19:7–19:10; 24:1–24:24.]. This Court finds Vess Hurley's testimony credible, and finds that his conclusions are supported by the evidence. However, even if HP's overall effect on the estate were considered neutral, HP has not met its burden of proving that it actually added value to the estate. Therefore, the Final Application must be denied in full for failing to satisfy the first prong of the fee application analysis: whether the services, viewed retrospectively, provided a identifiable, tangible, and material benefit to the Debtor's estate.

### E. HP's services did not appear reasonably likely to benefit the estate at the time they were performed.

The Final Application also fails under the second prong of the *Yazoo Pipeline* test, which provides an independent basis for denial. Additionally, it is worth noting that this second prong is essentially the same as the entire test that the majority of circuits use to evaluate fee applications and which the Fifth Circuit may revisit in a pending reconsideration of *Pro-Snax*. *See In re Woerner*, 758 F.3d 693, 702–03 (5th Cir.) *reh'g en banc granted*, 771 F.3d 820 (5th

21

Cir. 2014). In *Woerner*, Judge Prado penned a special concurrence urging reconsideration of *Pro–Snax* because "[i]t appears to conflict with the language and legislative history of § 330, diverges from the decisions of other circuits, and has sown confusion in our circuit" and stating that § 330 "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual benefit." *Id.* In light of this concurrence, it appears that the Fifth Circuit, on reconsideration of *Woerner*, may revisit the *Pro–Snax* standard with a positive view towards the prospective majority approach. *See supra* note 3. Therefore, this Court's conclusion that HP's services were not "objectively beneficial toward the completion of the case at the time they were performed," *Pro-Snax*, 157 F.3d at 426, also provides an alternative basis for denying the Fee Application should the Fifth Circuit adopt the majority approach.

Under this prevailing standard, professional services should be compensated if they "are reasonably likely to benefit the debtor's estate." *In re Ames Department Stores* at 72. To determine whether services are reasonably likely to benefit the estate, a court must determine whether the services comport with what a reasonable professional would have performed under the circumstances. *Id.* A brief inquiry into other cases in which investment bankers were retained to sell assets of a bankruptcy estate provides helpful background on the expectations in the industry. *See, e.g., In re Pub. Serv. Co. of New Hampshire*, 160 B.R. 404, 431 (Bankr. D.N.H. 1993); *In re Uni-Marts, LLC*, No. 08-11037 (MFW), 2010 WL 1347640, at *1 (Bankr. D. Del. Mar. 31, 2010); *McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, No. 89 CIV. 1489 (PNL), 1990 WL 138959, at *7 (S.D.N.Y. Sept. 19, 1990).

*Uni-Marts* provides an example of beneficial services. In that case, the investment banker was initially retained to complete a sale of substantially all of the Debtor's assets. 2010

WL 1347640, at *1. As in the case at bar, the initial results were unhappy—the stalking horse bid won the auction, and the stalking horse bidder ultimately could not produce the funds to finalize the sale. *Id.* However, the investment banker turned this initial failure into a success by dividing the Debtor's assets into individual stores. *Id.* The investment banker procured $2.2 million over the stalking bid price through these individual sales, by contacting more than 3,000 potential purchasers, responding to more than 300 due diligence requests, executing 310 confidentiality agreements, soliciting 100 bids, and finalizing sales with 26 ultimate buyers. *Id.* at *1, 3. Because of the extra work the investment banker performed and the corresponding success, the bankruptcy court granted a fee enhancement. *Id.* at *4.

In *Pub. Serv. Co. of New Hampshire*, by contrast, the investment banker did not rise to the occasion required by the Chapter 11 case in which it was engaged. 160 B.R. at 428–37. In that case, the court refused the investment banker's fee enhancement request after determining that the investment banker had done very little that could be expected to add value to the merger on which it was retained. *Id.* at 437. The court recognized that the merger involved particularly complicated bid procedures, but found that this did not excuse the investment banker's failure to perform. *Id.* at 432–34. The court equally rejected the investment banker's assertion that it could not create a bidding process because it did have full information, noting that the investment banker could have proceeded with alternative assumptions. *Id.* at 437. Ultimately, the court found the investment banker had played a mostly "passive role" and noted that a "transaction fee is not earned simply by [b]eing [t]here." *Id.* The court noted that the investment banker could not claim to have brought parties to which it had sent letters to the table since "they had all expressed interest from the earliest stages of the case." *Id.* The court recognized that

because of the investment banker's inactivity, equity interests had to resort to a "self-help program" of negotiating directly with interested parties. *Id.* at 433.

*McKinley Allsopp* represents a case in which the investment banking firm was simply unequipped to perform the required services. 1990 WL 138959, at *7. The court first summarized what could be expected of a reasonable investment banker hired to obtain financing:

> [I]n the investment banking world, an undertaking to use "best efforts" to obtain financing implies multifaceted obligations, which include learning the business to be financed, performing due diligence functions, authoring a descriptive memorandum, creating and generating financial models, identifying potential investors, contacting and screening potential investors, and working with the potential investors in an effort to convince them of the merits of the transaction.

*Id.* at *4. The court then determined that the firm was unprepared to perform these tasks because of "(1) the minimal number of people assigned to the project, (2) their lack of seniority, (3) their lack of experience in the financing business and in particular with respect to the business of [the debtor], and (4) the lack of contacts necessary to adequately market and sell the transaction." *Id.* at *7.

1.  **HP has not performed the services that a reasonable investment banking firm would have performed.**

In the case at bar, HP has not performed what would be expected of a reasonable investment banking firm. Like the investment banker in *Pub. Serv. Co. of New Hampshire*, HP did not rise to the occasion of performing the requisite services to overcome the particular challenges of the case on which it was retained. As did the court in *Pub. Serv. Co. of New Hampshire*, this Court acknowledges that challenges existed for HP, most notably in the case of Hurley. However, also as in *Pub. Serv. Co. of New Hampshire*, this Court finds those challenges were clearly surmountable. Specifically, this Court recognizes that the financial information initially provided by the Hurleys was not sophisticated. Both Hurley and Dishon were small

family-run businesses that experienced phenomenal growth due to the explosion of the oil industry surrounding the Bakken shale formation. [*See, e.g.*, Secured Creditors' Ex. 12]. The associated growing pains were a factor in the decisions to sell both companies to the Debtor. [*See, e.g.*, Secured Creditors' Ex. 9]. Hurley was particularly unsophisticated, and the Court acknowledges the challenges Herrera described in one email:

> Hurley Enterprises, Inc. is an operationally well-respected, financially unsophisticated family business. . . . After Waste Deep's merger with the Debtor, Hurley Enterprises, Inc. was requested to produce accrual-based financials. This caused substantial problems with their financial reporting. The underlying issue is Hurley Enterprises, Inc. bills for their equipment and services when the rig is mobilized. An accrual-based financial [sic] requires Hurley Enterprises, Inc. to estimate their unbilled revenues (i.e., % of work completed against the overall job order). The combination of a small, family run business, lacking financial infrastructure, operating a paper-based, field ticket system, that has grown to $46 million in annual revenue; has been a real challenge financially. They use Quickbooks for their accounting software (which is cash basis) and rely on a paper-based, field ticket system to record and track equipment rentals and staffing. They have no formal marketing or sales effort. Their Quickbooks records do not adequately or consistently categorize operating versus capital expenses. They are unable to produce detailed summaries of revenues by customer, revenues by product or service, detailed maintenance capital expenditures versus capital expenditures for growth purposes and other detailed monthly accrual-based financial information such as A/R and A/P agings.

[Secured Creditors' Ex. 12]. Furthermore, the Court recognizes that communication challenges existed between HP and Vess Hurley. As explained in an email from Secured Creditors' counsel to Herrera: "Vess is a great guy and very knowledgeable. However, he is a big picture guy and does not have a great deal of patience for paperwork. He also claims that he 'does everything in 12 minutes' and if it takes longer than that, he isn't interested." [Secured Creditors' Ex. 13, p. 2].

However, this Court finds that HP did not make the efforts of a reasonable investment banker to overcome these challenges. Like the investment banker in *Pub. Serv. Co. of New Hampshire* who could have made alternative assumptions with the information at its disposal,

HP had access to Hurley's admittedly unsophisticated financial information and could have used it. [Testimony of Vess Hurley, App. for Comp'n Hr'g Tr. 10:6–11:7]; [Testimony of Gilbert Herrera, Hearing of Oct. 1, 2014 at 10:38 a.m.]. Instead of taking advantage of this information, Herrera and his firm did little but wait on Hurley to provide better data for a four-month period. [Testimony of Gilbert Herrera, Hearing of Sept. 9, 2014 at 10:26–10:36 a.m.].[7] Worse, HP rejected offers of assistance from people connected to Hurley, stubbornly insisting that the information come from Vess Hurley. [*See* Secured Creditors' Ex. 13, p. 1] (in which Herrera writes in an email: "I would also add various actors suggest they speak for Vess or alternatively have requested that all inquiries should be directed through them. That would be counter productive and not be in Vess's economic or other interests."). Vess Hurley further testified that Hurley staff would ask HP for assistance in understanding HP's information requests, but did not receive any assistance. [*Id.* at 11:8–14]. When Herrera finally did meet with Hurley in December 2013, he did not present any Hurley-specific information, but instead showed a presentation prepared for Dishon! [Testimony of Vess Hurley, App. for Comp'n Hr'g Tr. 15:2–16:16.] Herrera did not ask any questions about Hurley financials or other information needed to market the company. *Id.* 16:21–24.

HP's expectations that the Hurley financial information be provided in a certain form, like the expectation of the investment banker in *Pub. Serv. Co. of New Hampshire* that a merger proceed according to a certain process, do not excuse HP's failure to adapt to the unexpected situation at hand. Like the investment banker in *Uni-Marts*, HP should have adjusted to the individual circumstances presented by the client, which for the Debtor might have entailed working more closely with the "various actors" who offered to help gather information about

---

[7] Indeed, according to Herrera's counsel, there was "virtually no communication" between HP and the Hurleys between August and December of 2013, and it was not clear "whose fault it was." [Closing Argument of HP's attorney, Hearing of Nov. 7, 2014 at 9:15 a.m.].

Hurley, or attempting to creatively market Hurley with the information available.  Instead, HP, like the investment banker in *Pub. Serv. Co. of New Hampshire*, played a mostly passive role. [Doc. No. 826, pp. 7–10].  A review of the scant evidence supporting the Final Application reveals the substance of HP's services.  HP only provided one exhibit substantiating its time sheets: a spreadsheet listing 41 acquisition candidates for Dishon.  [Herrera and HP's Ex. 5]. Through the parties objecting to the Final Application, a spreadsheet listing 42 candidates for Hurley was also admitted into evidence.  [Objectors' Joint Ex. 10].  These lists (the Candidate Lists) show that HP sent initial letters to 108 acquisition candidates.  [Herrera and HP's Ex. 5]; [Objectors' Joint Ex. 10].  Twenty of these candidates received non-disclosure or confidentiality agreements, and twelve received Confidential Information Memorandums on Hurley, Dishon, or both.  *Id.*  According to the Candidate Lists, as of mid–late April 2014, three had received "due diligence."  *Id.*  This evidence illustrates that the majority of the work HP performed was on a very superficial level; indeed, only twelve companies actually received information about one of the subsidiaries.

But what is more significant to the Court is the lack of initiative HP showed in pursuing these few more serious prospects.  HP did not make any trips outside Houston for the purpose of meeting with any potential purchasers for the Hurleys, and only took one trip for Dishon, to meet with Buckhorn.  [Testimony of Gilbert Herrera, Hearing of September 9, 2014 at 10:31 a.m.]. Herrera testified that on two occasions he visited prospects on out-of-town trips primarily scheduled for other purposes: one to Dallas and one to Canada.  [Hearing of August 20, 2014 at 9:16–19 a.m.].  However, these meetings are not substantiated by the time entries.  The entries confirm that Herrera billed the estate 1.4 hours for a meeting with one Gabriel Rio in Dallas on February 19, 2014.  [Doc. No. 826-1, p. 101].  But Herrera testified that Rio did not represent

any prospect, as at the time of the meeting Rio was unemployed, though he could still provide information about various prospects. [Hearing of August 20, 2014 at 9:26 a.m.]. No discussions with any prospects are referenced in the time entries of February 18–20, and for the entire month of February, the only prospect with which HP claims to have met with is Buckhorn. [Doc. No. 826-1, pp. 36–38, 96–107, 128–132]. As for the Canada trip, Herrera testified he could not remember when it occurred, but a search of all Canadian prospects from the Candidate Lists shows that HP never billed for discussions with more than one Canadian company in a single month. In fact, the only discussions with Canadian companies referenced are: (1) a total of 1.4 hours with Gibson Energy, Inc. on three separate dates in March; and (2) a total of 3.8 hours for three separate discussions with Newalta Corporation in December and January, one of which is specifically listed as a phone call. [Doc. No. 826-1, pp. 69, 82].

It is not clear if any of these "discussions" took place in person. Overall, Herrera testified that HP met with three or possibly four firms in Houston to discuss the Hurley sale, and none outside of Houston. [*Id.* at 10:31–10:33 a.m.]. The record is less clear as to Dishon, but Herrera testified that HP met with "dozens" of prospects who were interested in purchasing at least one of the subsidiaries. [Hearing of August 20, 2014 at 9:35 a.m.]. But when asked to name specific candidates without reference to the Final Application, Herrera could only name Waste Connections and SCF Partners. [*Id.* at 9:36 a.m.]. Reviewing the time entries, the only "meetings" listed for any prospects are with Buckhorn and with "R360/Waste Connections." [Final Application, Ex. D, pp. 47, 76–77]. There are other "discussions" listed, for example, an April 4, 2014 discussion with "SC Partners/Oil Patch" for which Herrera billed 2.1 hours. [*Id.* p. 147]. It is impossible to tell how many were in-person.

Furthermore, although HP claims to have "scheduled and organized three management presentations and on-site visits" for Dishon, HP billed for only one completed "management presentation" (to Buckhorn). [Final Application, p. 19]; [Final Application, Ex. D, p. 96]. Nor did HP ever bill the estate for accompanying a prospect on a site visit of either subsidiary, despite Herrera's testimony at the hearing on the Application to Employ that "there will have to be site visits." [App. to Employ Hr'g Tr. 12:11–12, July 10, 2013].

Like the investment banker in *Pub. Serv. Co. of New Hampshire*, HP cannot claim credit for bringing any buyers to the table, as the ultimate buyers (Buckhorn and the Hurleys) were involved before HP's engagement. Additionally, like the investment banker in *Pub. Serv. Co. of New Hampshire*, HP's passivity is reflected by the fact that other parties had to resort to self-help to compensate for the services not being performed. Here, the Hurleys had to market the company to potential buyers like the Moudy Group without Herrera's assistance, with unsuccessful results.

### 2. HP performed services that were outside the scope of its engagement.

Instead of performing the services of a reasonable investment banker, HP billed the estate for certain activities that were not within the scope of the firm's engagement. For example, Herrera billed the estate at least 20 hours for work performed in connection with helping the Debtor select an independent board member. [Final Application, Ex. D, pp. 36–41]. Herrera testified that the selection of an independent director advanced the sale process because it helped to obtain confirmation of a consensual plan, which potential buyers demanded. [Hearing of October 1, 2014 at 10:29 a.m.]. However, this same argument could be used to inflate the scope of HP's services limitlessly. This Court instead interprets HP's engagement agreements to only encompass activities that *both* advance the sales process and are within the role of an

"investment banking" firm. Under this interpretation, the Court finds that HP's work selecting an independent director was not within the role of an investment banker and therefore is not compensable.

HP also charged the estate excessively for time spent preparing the Final Application. In the Fifth Circuit, reasonable efforts spent preparing a fee application are compensable. *Matter of Braswell Motor Freight Lines, Inc.*, 630 F.2d 348, 351 (5th Cir. 1980). However, HP charged the estate $12,775 for 36.5 hours preparing the Final Application. This charge includes 21.4 hours ($7,490) to convert the Interim Application into the Final Application, though the Final Application covered only three additional months out of the nine-month period covered. When questioned, Herrera could not distinguish the amount of time spent *reviewing* the entries from the Interim Application and correcting for earlier mistakes, but describes this as a painstaking process requiring the firm to delete and re-enter all of the entries into QuickBooks. [Hearing of October 1, 2014, 9:40–41 a.m.]. The Court can therefore not calculate what percentage of the time charged for preparing the Final Application is reasonable.

3. **HP's limited resources highlight its unpreparedness to perform the services required to create value for the estate.**

Perhaps, like the investment banking firm in *McKinley Allsopp*, HP was simply unequipped to perform the services it was hired to perform. Indeed, HP proved itself to be a company with significantly fewer resources than it represented to this Court at the hearing on its Application to Employ. At that time, HP presented itself as having three levels of staff: "Managing Director & Director Level," "Vice President level," and "Associate level," to be compensated at $350 per hour, $274 per hour, and $200 per hour, respectively. [Doc. No. 68, at ¶ 14]. However, only two people are included in the hundreds of time entries submitted by HP: Herrera and Biggerstaff. Notably, both are billed at the highest level of $350 per hour. [Doc.

No. 826-1]. Furthermore, as the objecting parties have noted, HP was substantially limited in the "investment banking" services it could perform, as it employed no person registered with Financial Industry Regulatory Authority or the Texas Securities Board as an Investment Banker (Series 79 license) or as a registered broker. (Series 7 license).   [Objecting Parties' Memorandum, p. 2].  Instead, Herrera was only registered as a "business broker" or Securities Dealer Restricted to Business Brokerage Activities."  [*Id.*]; [*Id.* Ex. A.].  This limited license allows HP to:

> . . . act[] as broker[] between and among principals for the sale of a majority of the stock or equity securities of a privately held business pursuant to a privately negotiated purchase agreement, where the managerial control of the business will devolve upon the purchaser(s) and where compensation received by the firm will be payable for the brokerage activities only.

7 Tex. Admin. Code § 115.3(c)(2)(D).  This Court declines to hold that the lack of a Series 7 or Series 79 license disqualifies HP for the services it was hired to perform.  However, under all the facts and circumstances, this detail does illustrate the barebones nature of HP's operation.

In closing, counsel for HP stated: "At the end of the day no matter what you think about what Mr. Herrera did or did not do, you know while he was serving as financial advisor there were two sales that resulted in $4[1] million to the estate; the net result of that was payment in full to unsecured creditors . . . ."[8]  This conclusion implies that HP should be compensated simply for "being there."  To do so, however, would violate the majority standard requiring professionals to show that their services were reasonably likely to benefit the estate when performed.  At the end of the day, HP and its counsel have overlooked the paramount fact that it *does* matter what HP did or did not do.  Quite simply, HP has failed to show that what it did was

---

[8] Unsecured creditors were only paid in full because the Dishons and Hurleys partially relinquished their secured priority claims pursuant to a settlement agreement with the Debtor. [Doc. No. 673].

likely to benefit the estate at the time the services were rendered.  Therefore, the Final

Application must be denied.

### F. HP did not comply with the disclosure requirements of Bankruptcy Rule 2014.

Finally, this Court finds that HP failed to comply with the disclosure requirements of

Bankruptcy Rule 2014, which, by itself, is sufficient justification for denying the Final

Application in full.  Bankruptcy Rule 2014 provides that the application for the employment of a

professional by a debtor-in-possession:

> shall state . . . to the best of the applicant's knowledge, all of the person's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

The Application to Employ disclosed the following regarding the relationship between

Herrera and Debtor's counsel, Hoover Slovacek:

(i)    Herrera has known Edward L. Rothberg ("Rothberg"), counsel for the Debtor, on a professional and personal basis for numerous years;

(ii)   Herrera is a member and former President of the Houston Chapter Turnaround Management Association in which Rothberg is a member and former President and other Hoover Slovacek LLP ("HSLLP") colleagues are also members;

(iii)  Herrera also has professional connections with Joseph Slovacek and Matt Kornhauser of HSLLP.  Over the years, Herrera has been involved in various professional and/or political organizations in which Joseph Slovacek and Matt Kornhauser may have been members.

(iv)   Herrera has worked with Rothberg, HSLLP and Rothberg's former firm, Weycer, Kaplan, Pulsaki and Zuber, PC, in various bankruptcy matters in the Southern District of Texas including:

(a)   *In re IRH Vintage[Park] Partners et al*, Jointly Administered Under Case No. 10-37503 – engaged by Debtors' as expert witness;

(b)   *In re Christopher S. Mehaffie*, Case No. 09-31689 – engaged by creditor as consultant regarding valuation;

(c)   *In Bellaire General Hospital, LP*, Case No. 05-30089 – engaged by Official Committee of Unsecured Creditors as investment banker;

(d)   *In re William Kilroy*, Case No. 05-90083 – engaged by creditor as consultant regarding valuation;

(e)   *In re Sterling Affiliates*, Case No. 02-37578 – engaged by Debtor as investment banker.

(v)   In the past, Herrera has been engaged in various other non-bankruptcy-related matters in which various attorneys for Hoover Slovacek and Weycer Kaplan Pulaski & Zuber, P.C. ("WKPZ"), including, but not limited to, Rothberg, Joseph Slovacek, Matt Kornhauser and Michael Ballases, have also been involved. However, HSLLP and WKPZ did not engage or pay Herrera in any of these matters. Further, none of these matters has any relation to the Debtor or it[s] related entities.

Application to Employ at pp. 6–7. However, the Application to Employ failed to disclose that

Rothberg and his law firm (Hoover Slovacek) had represented both Herrera and HP when HP

appealed this Court's denial of his fee application in *In re IRH Vintage Park Partners, L.P.*, 456

B.R. 673 (Bankr. S.D. Tex. 2011). Herrera admitted this fact during the September 9, 2014

hearing when confronted with the notice of appeal signed by Rothberg as attorney for both

Herrera and HP. [Hearing of September 9, 2014 at 9:27]; [Notice of Appeal filed by Gilbert A.

Herrera and Herrera Partners, Case No. 10-37503, Doc. No. 288].

In the Fifth Circuit, failure to make the disclosures required by Rule 2014 is sufficient

cause for total denial of a fee application. *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465–66

(5th Cir. 2012); *In re W. Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005). Failure to

disclose may even be reason to disgorge fees already paid. *Matter of Prudhomme*, 43 F.3d 1000,

1004 & n.2 (5th Cir. 1995). The Fifth Circuit has twice stated this rule unequivocally. *In re Am.*

*Int'l Refinery, Inc.*, 676 F.3d at 465–66; *In re W. Delta Oil Co., Inc.*, 432 F.3d at 355 (stating that "failure to disclose is sufficient grounds to revoke an employment order and deny compensation"). While bankruptcy courts have full discretion to determine the appropriate sanction, the Fifth Circuit has also advised that "an important consideration is whether the failure was intentional." *In re Am. Int'l Refinery, Inc.*, 676 F.3d at 466.

Here, HP undoubtedly violated Rule 2014, and therefore this Court is within its discretion to deny the Final Application in full and disgorge amounts already paid. The plain language of Rule 2014 requires that an Application to Employ "shall state . . . to the best of the applicant's knowledge, all of the person's connections with the Debtor, creditors, any other party in interest, [and] their respective attorneys and accountants." Fed. R. Bankr. P. 2014. Herrera admitted that he knew that Rothberg and Hoover Slovacek had represented him and his firm in the *In re IRH Vintage Park Partners* appeal. Yet he did not disclose this connection on the Application to Employ. Therefore, HP violated Rule 2014. As noted in the preceding paragraph, in the Fifth Circuit, a failure to disclose under Rule 2014 is sufficient to wholly deny a fee application. Moreover, the Court finds that the connection HP failed to disclose is evidence of a generally incestuous relationship between HP and Hoover Slovacek. Indeed, Hoover Slovacek billed the estate 11.1 hours for services rendered in connection with the Interim Application, rather than HP hiring its own counsel to assist it in drafting, filing, and prosecuting this interim application. [Secured Creditors' Ex. 7, pp. 328–39]. The close relationship between Hoover Slovacek and HP, when combined with HP's deception regarding this relationship, creates an appearance of impropriety that suggests to the Court that Hoover Slovacek and HP were more concerned about creating value for each other than for the Debtor.

34

Finally, though it is not necessary to the Court's conclusion, this Court notes that HP's failure to disclose appears to be intentional. In the Application to Employ, HP stresses that Hoover Slovacek and Rothberg's former firm (Weycer, Kaplan, Pulaski & Zuber, P.C.) "did not engage or pay Herrera in any of these matters." This emphasis indicates that HP was aware of the significance of a professional-client relationship in a conflict analysis. HP's failure to disclose the existence of a professional-client relationship in one direction while pointedly denying its existence in the other direction suggests a deliberate omission. Moreover, the fact that the omission is in the context of an appeal of one of this Court's denials of a previous fee application of HP's suggests that HP may have intentionally avoided reminding this Court of its history of failing to provide identifiable, tangible, and material benefits to bankruptcy estates. *In re Am. Int'l Refinery, Inc.*, 456 B.R. at 675.

Regardless of whether HP's omission was truly intentional, the failure to disclose Rothberg's representation of HP and Herrera in *Vintage Park Partners* appeal was clearly in violation of Rule 2014, and therefore this Court is justified in reducing HP's fees or denying the Final Application in entirety. *In re Am. Int'l Refinery, Inc.*, 676 F.3d at 465–66. Were the Rule 2014 violation the only defect in the Final Application, this Court would not resort to the extreme remedy of full denial. However, under the totality of the circumstances in the instant matter, this Court finds full denial appropriate.

## V.   Conclusion

In sum, the Final Application is denied for four reasons: (1) HP's failure to keep detailed, contemporaneous records of each individual activity; (2) HP's failure to establish that its services resulted in "an identifiable, tangible, and material benefit to the bankruptcy estate" required by *Pro-Snax*; (3) HP's failure to establish that its services were reasonably likely to benefit the

estate at the time they were performed; and (4) HP's failure to comply with the disclosure requirements of Bankruptcy Rule 2014. This Court concludes that the first three reasons each provide independent bases for denying the Final Application. The fourth, HP's violation of Rule 2014, further supports this Court's conclusion that wholesale denial of the Final Application is appropriate.

Consequently, this Court will deny the Final Application and order HP to disgorge all monies previously received for the services listed therein. *See Matter of Prudhomme*, 43 F.3d at 1004 & n.2; *In re IRH Vintage Park Partners*, 456 B.R. at 677. An order denying the Final Application has been entered concurrently with this Opinion.

Signed this 12th day of January, 2015.

Jeff Bohm
Chief United States Bankruptcy Judge