

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**08/21/2015**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Digerati Technologies, Inc.,** | § | **Case No. 13-33264-H4-11** |
| | § | |
| Debtor. | § | **Chapter 11** |
| | § | |

---

### MEMORANDUM OPINION REGARDING THIRD AND FINAL APPLICATION OF DEBTOR'S COUNSEL HOOVER SLOVACEK LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD BEGINNING MAY 30, 2013 THROUGH APRIL 4, 2014
[Doc. No. 831]

#### I. INTRODUCTION

The Court issues this opinion in the wake of the Fifth Circuit's issuance of *In re Woerner*, 783 F.3d 266 (5th Cir. 2015), a watershed case because of its rejection of the 17-year-old holding of *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998). Now, the law in the Fifth Circuit is that bankruptcy courts should evaluate fee applications under a "good gamble" approach rather than the "identifiable, tangible, material benefit" retrospective standard. The debtors' bar is breathing a sigh of relief in the wake of this change in the law. However, as this opinion shows, merely because *Pro-Snax* is gone does not necessarily mean that fee applications will more easily be approved in their entirety.

On May 2, 2014, Hoover Slovacek, LLP (the "Applicant"), counsel for Digerati Technologies, Inc. (the "Debtor"), filed the Third and Final Application of Debtor's Counsel Hoover Slovacek LLP for Allowance of Compensation for Services and Reimbursement of Expenses for the Period Beginning May 30, 2013 Through April 4, 2014 (the "Fee Application"). [Doc. No. 831]. In the Fee Application, the Applicant requests this Court's approval of fees in the amount of $1,155,321.50, reimbursable expenses in the amount of

$97,406.66, and fees and expenses for the preparation of the Fee Application in the amount of $10,000.00, for a total sum of $1,262,728.16. The Court notes that during the pendency of the case, it awarded fees and expenses to the Applicant on an interim basis under the then-prevailing *Pro-Snax* standard. However, because *Woerner* has since replaced *Pro-Snax*, this Court now reviews all of the services rendered, and the expenses incurred, under the new standard articulated in *Woerner*.

On May 22, 2014, Hunter Carr; Rhodes Holdings, LLC; Robert Rhodes ("Rhodes"); American Equity Fund, LLC; WEM Equity Investments, Ltd.; Recap Marketing & Consulting, LLC; Rainmaker Ventures II, Ltd.; William McIlwain; and Scott Hepford, John Howell, Robert L. Sonfield, Jr. and Robert L. Sonfield, P.C. d/b/a Sonfield & Sonfield (collectively, the "Objectors") filed an Amended Objection to the Fee Application (the "Amended Objection"). [Doc. No. 849]. On May 23, 2014, the Applicant filed a response to the Amended Objection. [Doc. No. 855].

This Court held a multi-day hearing on the Fee Application on May 27, 2014, July 8, 2014, August 19, 2014, August 28, 2014, September 23, 2014, January 9, 2015, January 16, 2015, and January 30, 2015, on which date the Applicant concluded its case-in-chief. At this point, the Objectors orally moved for a judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052,[1] arguing that the Applicant's evidence was insufficient to show entitlement to any fee award. The Court granted the parties time to submit briefing on the motion for judgment on partial findings, and both sides did so. [*See* Doc. Nos. 1129 & 1130]. On May 1, 2015, after considering this briefing, the Court denied the oral motion and ordered the Objectors to submit a witness list and an estimate of the amount of time their case in chief would

---

[1] Any reference to "the Rules" refers to the Federal Rules of Bankruptcy Procedure. Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

require. [Doc. No. 1132]. The Objectors declined to present a case in chief, but rather requested a hearing solely to make closing arguments based upon the existing trial record. The Court granted this request, and on May 22, 2015, heard closing arguments on the Fee Application. The Court then took the matter under advisement.

The Court now approves the Fee Application in part and denies it in part, and in accordance with Rules 9014 and 7052, issues the following Findings of Fact and Conclusions of Law explaining its decision. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party. For the reasons set forth herein, the Court approves $845,014.57 of the requested fees (including the fees for preparing the Fee Application), and $31,849.22 of the requested expenses; and disapproves $320,306.93 of the requested fees and $65,557.44 of the requested expenses.

## II. FINDINGS OF FACT

This Chapter 11 case was extremely acrimonious. Indeed, from the very outset of the case, there was a dispute about whether the board of directors that authorized the filing of the Chapter 11 petition was a legitimately constituted board. [*See* Doc. No. 318, pp. 6–8, ¶10–14]. Moreover, there was a dispute about whether the individual who signed the petition—i.e., Arthur Smith ("Smith")—was actually the duly authorized president of the Debtor who had the power to sign the petition. [Doc. No. 318, pp. 6–8, ¶10–13]. The Applicant was certainly aware of this very bitter dispute, which became even more pronounced after the failed mediation session that occurred a few months after the Chapter 11 petition was filed. Given these circumstances, this Court assesses the Fee Application with one eye constantly cocked on how the Applicant dealt

3

with those "frozen out" parties who believed that they were the properly constituted board of directors, or who believed the board which authorized the Chapter 11 filing was illegitimately constituted. This Court's analysis of the Fee Application also focuses closely on the myriad pleadings that the Applicant filed on behalf of the Debtor, many of which were opposed by those individuals who believed that they were the properly constituted board of directors or that the board which authorized the bankruptcy filing was illegitimately formed. The findings of fact relevant to the Fee Application given these—and other relevant—circumstances are as follows:

1. On May 30, 2013, the Debtor—a publicly-held company with approximately 6,000 shareholders—filed a voluntary Chapter 11 petition. [Doc. No. 1]. At the time of the filing of this petition, the Debtor was a holding company, and its primary and most valuable assets were the stock of two subsidiaries named Hurley Enterprises, Inc. and Dishon Disposal, Inc. [Doc. No. 831, 4¶9]. These two entities were very successful oilfield service companies. The Debtor acquired the stock of these two companies by executing and delivering promissory notes for $60 million payable to the former owners of these entities. [Doc. No. 41, p. 10 of 25]. These former owners therefore became the largest secured creditors of the Debtor. These owners were very unsophisticated individuals who spent most of their waking hours toiling in the oil patch to make these businesses successful.

2. On June 24, 2013, the Applicant, on behalf of the Debtor, filed its Emergency Motion for Authority to Incur Debt under 11 U.S.C. § 364(c) and § 105 (the "<u>Motion for Authority to Incur Debt</u>"). [Doc. No. 48]. The Court held a hearing on the Motion for Authority to Incur Debt on June 27, 2013. On June 28, 2013, this Court issued an Order Denying the Motion for Authority to Incur Debt for three separate and independent reasons: (1) the

Debtor failed to satisfy the requirement imposed by § 364(d)(1)(A) that the Debtor "is unable to obtain such credit otherwise"; (2) the Debtor failed to demonstrate that the proposed loans were necessary to avoid immediate and irreparable harm to the estate; and (3) the Debtor failed to show how it was beneficial to the estate to pay the proposed salaries of the three individuals—i.e., Smith, Antonio Estrada ("Estrada"), and Katie Keller ("Keller")—referenced in the Motion for Authority to Incur Debt. [Doc. No. 63].

3. On June 24, 2013, the Applicant, on behalf of the Debtor, filed its Motion for Leave to File Official Form 26 Under Seal (the "Motion to Seal"). [Doc. No. 47]. The Court held a hearing on the Motion to Seal on July 23, 2013. On this same day, this Court issued an Order Denying the Motion to Seal because the Applicant, on behalf of the Debtor, woefully failed to prove that the financial information of its subsidiaries deserved protection under § 107(b) and also failed to show any compelling reason to justify non-disclosure. [Doc. No. 130].

4. On July 3, 2013, the Applicant, on behalf of the Debtor, filed its Motion for Authority to Incur Debt Under 11 U.S.C. §§ 364(c)(1), 503(b)(1), and 507 (the "Second Motion for Authority to Incur Debt"). [Doc. No. 74]. The Court held a hearing on the Second Motion for Authority to Incur Debt on July 22, 2013. On July 30, 2013, the Court issued an Order Denying the Second Motion for Authority to Incur Debt because the Debtor: (1) failed to meet its burden to demonstrate that the proposed loan proceeds were necessary to pay certain line item expenses; and (2) failed to convince this Court that the Debtor needed the services of two individuals (Smith and Estrada) who were each receiving $5,000.00 per month. [Doc. No. 156].

5.  On July 8, 2013, the Applicant filed its Motion for Order Establishing Procedure for
    Interim Compensation of Professionals (the "Motion for Procedures").  [Doc. No. 79].
    This Court held a hearing on the Motion for Procedures on September 12, 2013.  On
    September 13, 2013, the Court issued an Order granting in part and denying in part the
    Motion for Procedures based on the oral ruling made at the hearing.  [Doc. No. 280].  The
    Court denied this request in part because the unusually acrimonious nature of this case
    made the Applicant's request for automatic periodic fee disbursements inappropriate.
    [Hr'g held on Sept. 12, 2013, at 3:17–3:21 P.M.].

6.  On July 18, 2013, the Applicant, on behalf of the Debtor, filed its Application to Approve
    Employment of Public Accountant for a Limited Purpose (the "Application to Employ
    Public Accountant") seeking to employ Carlos Lopez and LBB & Associates, Ltd., LLP.
    [Doc. No. 107].  This Court held a hearing on the Application to Employ Public
    Accountant on September 20, 2013.  On this same day, the Court issued an Order
    Denying the Application to Employ Public Accountant because the Debtor failed to
    adduce testimony in support of the Application to Employ Public Accountant.  [Doc. No.
    296].  The Debtor failed to adduce testimony because the Applicant, who was
    representing the Debtor, failed to bring any witnesses to adduce testimony in support of
    the Application to Employ Public Accountant.  [Hr'g Minutes for Hr'g held on Sept. 20,
    2013].

7.  On August 16, 2013, the Applicant, on behalf of the Debtor, filed its Motion to Clarify
    the Court's Order Granting Defendant Robert L. Sonfield, Jr. P.C. d/b/a Sonfield &
    Sonfield and Robert L. Sonfield Jr.'s Motion to Remand Adversary Proceeding (the
    "Motion to Clarify").  [Adv. No. 13-03118, Doc. No. 48].  On August 26, 2013, this

Court issued an Order Denying the Motion to Clarify because the Court's order of August 9, 2013, [Adv. No. 13-03118, Doc. No. 43], was unambiguous and did not need clarification. [Adv. No. 13-03118, Doc. No. 49].

8.  On August 28, 2013, the Applicant, on behalf of the Debtor, filed its Application to Approve Employment of Special Corporate and Securities Counsel (the "Application to Employ SEC Counsel") seeking to employ David M. Loev ("Loev") and the Loev Law Firm. [Doc. No. 254]. On August 30, 2013, the Applicant, on behalf of the Debtor, withdrew the Application to Employ SEC Counsel. [Doc. No. 260].

9.  On September 9, 2013, the Applicant, on behalf of the Debtor, filed its Emergency Motion to Extend the Deadline to Provide Proof of Filing 2012 Federal Income Tax Return (the "Emergency Motion to Extend Deadline"). [Doc. No. 274]. On September 19, 2013, this Court held a hearing on the Emergency Motion to Extend Deadline. On the same day, the Court issued an Order Denying the Emergency Motion to Extend Deadline because there was insufficient cause to grant the relief requested on an emergency basis. [Doc. No. 291].

10. On September 23, 2013, the Applicant filed its First Interim Fee Application of Debtor's Counsel Hoover Slovacek LLP for Allowance of Compensation for Services and Reimbursement of Expenses for the Period Beginning May 30, 2013 Through August 31, 2013 and Request for Hearing Within 7 Days (the "First Interim Fee Application"). [Doc. No. 302]. On October 18, 2013, this Court held a hearing on the First Interim Fee Application. On October 23, 2013, the Court issued an Order Approving in Part and Denying in Part the First Interim Fee Application (the "Order on the First Interim Fee Application"). [Doc. No. 406]. Specifically, the Court authorized the Debtor to pay the

Applicant attorneys' fees in the amount of $264,357.50 and expenses in the amount of $24,943.20, for a total of $289,300.70. [*Id.* at p. 3]. The Court denied all other requested fees, which totaled $37,094.50. [*Id.*]. As of the date of the filing of the Fee Application, the Applicant had received sufficient funds to pay the entire amount of the $289,300.70 that this Court had approved. [Doc. No. 831, 36 ¶ 32].

11. On September 27, 2013, the Applicant, on behalf of the Debtor, filed its proposed Chapter 11 Plan of Reorganization (the "Proposed Plan"). [Doc. No. 313]. On the same day, the Applicant, on behalf of the Debtor, filed a proposed disclosure statement in support of the Proposed Plan (the "Proposed Disclosure Statement"). [Doc. No. 314]. On October 25, 2013, the Applicant, on behalf of the Debtor, filed a Supplemental Exhibit "2" to the Proposed Plan. [Doc. No. 427]. On the same day, the Applicant, on behalf of the Debtor, filed a supplement to the Proposed Disclosure Statement. [Doc. No. 428]. On October 29, 2013, the Applicant, on behalf of the Debtor, filed an amended supplement to the Proposed Disclosure Statement. [Doc. No. 434].

12. On November 4, 2013, the Applicant, on behalf of the Debtor, filed its Notice of Issuance of Subpoenas for Rule 2004 Examinations to Jennifer Abney, Robert L. Sonfield, Jr., and Martha Tessier a/k/a Mardy Tessier. [Doc. No. 447]. On November 5, 2013, this Court issued an Order Quashing Subpoena for Rule 2004 Examination of Robert L. Sonfield, Jr. because the Applicant (in its representation of the Debtor) had disregarded the Court's determination at a prior status conference that the 2004 Examination of Robert L. Sonfield, Jr. would take place on December 6, 2013. [Doc. No. 450].

13. On November 20, 2013, the Applicant filed its Second Interim Fee Application of Debtor's Counsel Hoover Slovacek LLP for Allowance of Compensation for Services

and Reimbursement of Expenses for the Period Beginning September 1, 2013 Through October 31, 2013 and Request for Hearing Within 7 Days (the "Second Interim Fee Application"). [Doc. No. 497]. This Court held a hearing on the Second Interim Fee Application on January 6, 2014. On January 8, 2014, the Court issued an Order Approving the Second Interim Fee Application (the "Order on the Second Interim Fee Application"), approving attorneys' fees in the amount of $240,869.00 and expenses in the amount of $19,017.27, for a total of $259,886.27. [Doc. No. 658]. As of the date of the filing of the Fee Application, the Applicant had received funds totaling $132,620.78 against the approved amount of $259,886.27. [Doc. No. 831, 36 ¶ 32]. Thus, as of the date of the filing of the Fee Application, the Applicant had received total funds of $421,921.48—representing payments to retire the entire amount awarded under the First Interim Fee Application (i.e., $289,300.70), plus payments of $132,620.78 to retire a portion of the entire amount awarded under the Second Interim Fee Application (i.e., $259,886.27).

14. On December 4, 2013, this Court held a hearing on a discovery dispute. Specifically, pursuant to this Court's order of November 5, 2013, [Doc. No. 451], a 2004 examination was to take place on December 2, 2013 of David Gorham ("Gorham"). A question had been posed to Gorham to which his attorney, Joe Luce ("Luce"), instructed him not to answer due to the alleged existence of a non-disclosure agreement. The Court therefore reviewed information received from Luce in his effort to convince this Court that Gorham should not be required to answer the question posed to him. At the conclusion of the hearing held on December 4, 2013, the Court found that there was no non-

disclosure agreement in existence, and therefore ordered that Gorham answer the question posed to him. [Hr'g held on Dec. 4, 2013 at 11:07:43 A.M.–11:07:49 A.M.].

15. On December 7, 2013, the Applicant, on behalf of the Debtor, filed an addendum (the "Addendum"), [Doc. No. 563-1], to an amended settlement agreement (the "Amended Settlement Agreement") that it had asked this Court to approve in a motion to compromise that the Applicant (on behalf of the Debtor) had already filed on September 27, 2013, [Doc. No. 312]. On December 9, 2013, Scott Hepford; the Lunaria Heritage Trust; Robert Rhodes, Rhodes Holdings, LLC; William McIlwain; Recap Marketing & Consulting, LLP; American Equity Fund, LLP; and WEM Equity Fund, LLC filed the Emergency Motion to Continue Hearing on Motion to Compromise, asserting that the Addendum substantially modified the Amended Settlement Agreement and "creates substantial prejudice and hardship on the objecting parties" (the "Emergency Motion to Continue Hearing"). [Doc. No. 576]. On the same day, the Applicant, on behalf of the Debtor, filed a response to the Emergency Motion to Continue Hearing. [Doc. No. 577]. The Applicant, on behalf of the Debtor, also filed a Notice of Corrected Exhibit B to the Debtor's Response to the Emergency Motion to Continue Hearing. [Doc. No. 579]. The Court held a hearing on December 11, 2013, and orally ruled that the Addendum should be stricken because it was prejudicial to those parties who filed the Emergency Motion to Continue Hearing. On the same day, this Court issued an Order Striking Addendum to Amended Settlement Agreement. [Doc. No. 594].

16. On January 10, 2014, the Applicant, on behalf of the Debtor, filed an amended Proposed Plan (the "Proposed First Amended Plan"). [Doc. No. 665].

17. On January 13, 2014, the Applicant, on behalf of Gilbert Herrera ("Herrera") and Herrera Partners, filed the First Interim Fee Application of Debtor's Investment Bank[er] Gilbert A. Herrera and Herrera Partners for Allowance of Compensation for Services and Reimbursement of Expenses for Period Beginning July 1, 2013 Through December 31, 2013 and Request for Hearing Within 7 Days (the "Herrera Fee Application"). [Doc. No. 669]. On the same day, the Applicant amended the Herrera Fee Application (the "Amended Herrera Fee Application"), [Doc. No. 670], and Notice of the Herrera Fee Application, [Doc. No. 671]. On May 2, 2014, the Applicant, once again on behalf of Herrera, filed a Final Fee Application of Debtor's Investment Banker Gilbert A. Herrera and Herrera Partners for Allowance of Compensation for Services and Reimbursement of Expenses for the Period Beginning July 1, 2013 Through April 4, 2014 (the "Herrera Final Fee Application"). [Doc. No. 826]. On May 7, 2014, the Applicant, on behalf of Herrera, filed a Notice of Withdrawal, withdrawing the Amended Herrera Fee Application because the fees and expenses sought were included in the Herrera Final Fee Application. [Doc. No. 842]. This Court held a multi-day hearing on the Herrera Final Fee Application on July 22, 2014; August 18, 2014; August 20, 2014; September 9, 2014; October 1, 2014; October 14, 2014; and November 7, 2014.[2] On January 12, 2015, the Court denied the Herrera Final Fee Application in its entirety. [Doc. No. 1057]. The Court issued a memorandum opinion explaining its ruling that Herrera provided no benefit to the estate under either the *Pro-Snax* standard or the more flexible prospective approach already adopted by several other circuits. [Doc. No. 1056]; *In re Digerati Technologies, Inc.*, 524 B.R. 666, 673 (Bankr. S.D. Tex. 2015).

---

[2] The Court intended to begin the hearing on May 27, 2014, but because exhibits had not been timely exchanged under the applicable local rule, the Court actually began hearing testimony and admitting exhibits on July 22, 2014.

18. On January 21, 2014, the Applicant, on behalf of the Debtor, amended the Proposed First Amended Plan (the "Proposed Second Amended Plan"), [Doc. No. 684], and amended the Proposed Disclosure Statement (the "First Amended Disclosure Statement"), [Doc. No. 685]. On the same day, this Court signed an Order Conditionally Approving the First Amended Disclosure Statement, Authorizing Debtor to Solicit Votes and Setting Confirmation Hearing. [Doc. No. 687].

19. On January 30, 2014, the Applicant, on behalf of the Debtor, filed its Non-Material Modifications to the Second Amended Plan and First Amended Disclosure Statement Dated January 21, 2014 Pursuant to Section 1127 of the Bankruptcy Code (the "Non-Material Modifications"). [Doc. No. 700]. On the same day, the Applicant, on behalf of the Debtor, filed the Emergency Motion to Approve the Non-Material Modifications (the "Emergency Motion to Approve"), [Doc. No. 701], and the Tabulation of Balloting on the Second Amended Plan, [Doc. No. 702]. The Court held a multi-day hearing on the Proposed Second Amended Plan, the First Amended Disclosure Statement, and the Emergency Motion to Approve. At the close of the hearing on January 31, 2014, the Court ordered the Debtor's counsel (i.e., the Applicant) to incorporate the Non-Material Modifications by redlining the Proposed Second Amended Plan.

20. On February 3, 2014, the Applicant, on behalf of the Debtor, filed a redlined version of the Proposed Second Amended Plan. [Doc. No. 708]. On February 4, 2014, the Applicant, on behalf of the Debtor, amended the Non-Material Modifications (the "Amended Non-Material Modifications"). [Doc. No. 713]. On the same day, the Applicant, on behalf of the Debtor, filed the Second Amended & Restated Chapter 11 Plan of Reorganization Dated January 21, 2014, Including Amended Modifications Filed

on February 4, 2014, and Corrections to Typographical Errors (the "Second Amended Plan with Amended Modifications"). [Doc. No. 714]. Later that day, the Applicant, on behalf of the Debtor, filed a Notice of Filing with a redlined version of the Second Amended Plan with Amended Modifications. [Doc. No. 715].

21. On February 4, 2014, the Applicant, on behalf of the Debtor, amended the Amended Non-Material Modifications (the "Second Amended Non-Material Modifications"). [Doc. No. 722]. On the same day, the Applicant, on behalf of the Debtor, amended the Emergency Motion to Approve. [Doc. No. 723]. On February 5, 2014, the Applicant, on behalf of the Debtor, filed a Second Amended & Restated Chapter 11 Plan of Reorganization Dated January 21, 2014, Including All Modifications and Corrections to Typographical Errors (the "Second Amended Plan with All Modifications"). [Doc. No. 726]. On the same day, the Applicant, on behalf of the Debtor, filed a Notice of Filing with a redlined version of the Second Amended Plan with All Modifications attached as Exhibit A. [Doc. No. 727].

22. On February 6, 2014, the Applicant, on behalf of the Debtor, filed a Second Amended & Restated Chapter 11 Plan of Reorganization Dated January 21, 2014, Including All Modifications and Corrections to Typographical Errors Dated February 6, 2014 (the "Plan"). [Doc. No. 731]. On the same day, the Applicant, on behalf of the Debtor, filed a Notice of Filing with a redlined version of the Plan attached as Exhibit A. [Doc. No. 732]. On February 11, 2014, the Court issued an Order Denying Confirmation of the Plan (the "Order Denying Confirmation of the Plan"). [Doc. No. 739]. Specifically, the Court denied confirmation of the Plan because the Debtor failed to satisfy the requirement of § 1129(a)(5)(A)(ii) that the appointment or continuance in office of all

13

proposed officers and directors be "consistent with the interests of creditors and equity security holders and with public policy." [*Id.*].[3]

23. On February 18, 2014, the Applicant, on behalf of the Debtor, filed the Motion to Approve Selection Process for Independent Director(s) of Debtor and/or Independent Directors of Reorganized Debtor Pursuant to an Amended Plan (the "Motion to Approve Selection Process for Independent Director"). [Doc. No. 749]. On March 10, 2014, the Applicant, on behalf of the Debtor, filed a Notice of Withdrawal, withdrawing the Motion to Approve Selection Process for Independent Director. [Doc. No. 781].

24. On February 25, 2014, the Applicant, on behalf of the Debtor, filed a Notice of Appeal (the "Notice of Appeal"), [Doc. No. 765], intending to appeal the Order Denying Confirmation of the Plan. On February 27, 2014, the Court issued an order putting the Applicant on notice that it would not be "disposed to approve any fees for services rendered relating to this appeal" because the Debtor's conduct—prosecuting an appeal of the Order Denying Confirmation of the Plan, while simultaneously negotiating and working on filing a joint plan—was questionable given that existing Fifth Circuit law suggested that an order denying confirmation of a plan is not a final order that can be appealed.[4] [Doc. No. 767]. On February 28, 2014, the Applicant, on behalf of the Debtor, filed a Notice of Withdrawal, withdrawing the Notice of Appeal. [Doc. Nos. 771 & 791].

25. On February 27, 2014, a joint plan (the "Joint Plan") and a disclosure statement (the "Final Disclosure Statement") was filed by certain parties-in-interest, creditors, and the

---

[3] This Court subsequently issued a memorandum opinion discussing its reasons for denying confirmation of the Plan. *In re Digerati Technologies, Inc.*, 2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014).

[4] It is worth noting that the Supreme Court has since issued an opinion holding that denial of a proposed Chapter 13 plan is not a final order that can be appealed. *Bullard v. Blue Hills Bank*, 135 S.Ct. 1686 (2015). This Court sees no reason why *Bullard* would not apply to Chapter 11 plans as well.

Debtor. [Doc. Nos. 768 & 769]. On March 3, 2014, the Court signed an Order Conditionally Approving the Final Disclosure Statement. [Doc. No. 774]. On April 4, 2014, the Court held a hearing on the Joint Plan. At this hearing, Craig Power, counsel for the largest secured creditors in this case, took the lead in prosecuting the Joint Plan, including making an opening statement and then proffering the testimony of several witnesses in support of the Joint Plan. On the same day, this Court signed an Agreed Order Confirming the Joint Plan. [Doc. No. 795].

26. On May 2, 2014, the Applicant filed the Fee Application. [Doc. No. 831]. On May 9, 2014, the Objectors filed their Objection to Third and Final Application of Debtor's Counsel for Allowance of Compensation for Services and Reimbursement of Expenses (the "Objection"). [Doc. No. 843]. On May 22, 2014, the Objectors filed their Amended Objection to Fee Application (already defined as the Amended Objection). [Doc. No. 849]. On May 23, 2014, the Applicant filed a response to the Objection and the Amended Objection. [Doc. No. 855].

27. On May 26, 2014, the Applicant filed its Expedited/Emergency Motion to Strike the Objection and the Amended Objection (the "Motion to Strike"). [Doc. No. 863]. On the same day, the Applicant filed a Corrected Exhibit B, [Doc. No. 864], and amended the Motion to Strike (the "Amended Motion to Strike"), [Doc. No. 865]. On May 27, 2014, this Court held a hearing on the Amended Motion to Strike. On the same day, this Court issued an Order Denying the Amended Motion to Strike because the Applicant should have timely filed a motion to strike after the Objection was filed, but instead the Applicant waited until the eleventh hour before the hearing on the Fee Application. [Doc. No. 868].

### III. CREDIBILITY OF WITNESSES

Three witnesses testified during the multi-day hearing on the Fee Application: Edward Rothberg ("ELR" or "Rothberg"), a partner at Hoover Slovacek, LLP; Deirdre Carey Brown ("DCB" or "Brown"), of counsel at Hoover Slovacek, LLP; and Johnie Patterson, of Walker & Patterson PC, who represents some of the Objectors. The Court finds that all witnesses were credible and accords their testimony equal weight. Having made this finding, however, the Court notes that the testimony from Rothberg and Brown (two of the attorneys from the Applicant who provided extensive services in this case) was lacking with respect to describing why many of the services set forth in the Applicant's timesheets were either necessary to the administration of the case or beneficial to the estate. This deficiency in their testimony has led this Court to find that in numerous instances, as discussed herein, the Applicant has failed to satisfy its burden of proving that the fees requested for certain services are reasonable or necessary. *See Matter of Evangeline Ref. Co.*, 890 F.2d 1312, 1326 (5th Cir. 1989) (holding that "[t]he applicant bears the burden of proof in a fee application case . . . [and a fee] application must be sufficiently detailed and accurate that, in conjunction with any proceeding in connection therewith and the record in the case, a court can make an independent evaluation as to what level of fees are actual, necessary and reasonable.").

### IV. CONCLUSIONS OF LAW

**A.    Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order**

1.    Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b). This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of this Chapter 11 estate. Further, it is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(B) because it involves the allowance or disallowance of claims against the estate—namely, the Applicant's claim for fees and expenses. Additionally, this contested matter is core pursuant to 28 U.S.C. § 157(b)(2)(O) because it involves the adjustment of the debtor-creditor relationship insofar as the fee and expense reimbursement request of the Applicant—a creditor of the Debtor's estate—is being granted in part and denied in part. Finally, it is core pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under §157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance.").

### 2. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1) for the reasons set forth in this Court's Findings of Fact and Conclusions of Law entered on the docket on September 30, 2013. [Doc. No. 318].

### 3. Constitutional Authority to Enter a Final Order

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. The pending

dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under § 157(b)(2)(A), (B), and (O) is entirely different than a core proceeding under § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. B.A.P. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the claim brought by the Applicant is based solely on an express Code provision (§ 330) and judicially-created bankruptcy law interpreting this provision. This Court is therefore constitutionally authorized to enter a final order on the Fee Application. *See In re Airhart*, 473

18

B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting that the court has constitutional authority to enter a final order when the dispute is based upon an express provision of the Code and no state law is involved).

Finally, in the alternative, this Court has the constitutional authority to enter a final order because all of the parties in this contested matter have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent. . . ."). Indeed, the Applicant filed its Fee Application in this Court, [Finding of Fact No. 26]; the Objectors filed an initial objection and then thereafter filed the Amended Objection, [*Id.*]; the Applicant then filed its response to the Amended Objection, [*Id.*], and also filed its Motion to Strike the Amended Objection, [Finding of Fact No. 27], which this Court denied, [*Id.*]; and the parties proceeded to make a record in a multi-day hearing without ever objecting to this Court's constitutional authority to enter a final order on the Fee Application. If these circumstances do not constitute implied consent, nothing does.

**B.    Standard for Professional Compensation**

Section 330 of the Code governs compensation for a debtor's counsel. *In re MSB Energy, Inc.*, 450 B.R. 659, 661 (Bankr. S.D. Tex. 2011). A court may award "reasonable compensation for actual, necessary services rendered" by debtor's counsel and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)–(B). Section 330(a)(3) instructs courts, "[i]n determining the amount of reasonable compensation," to "take into account all relevant factors, including":

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Furthermore, § 330 mandates that "the court *shall not* allow any compensation for—"

    (i) Unnecessary duplication of services; or
    (ii) Services that were not—
        (I) Reasonably likely to benefit the debtor's estate; or
        (II) Necessary to the administration of the case.

This Court has an independent duty to examine the reasonableness of the fees in the Fee Application. *See In re WNS, Inc.*, 150 B.R. 663, 664 (Bankr. S.D. Tex. 1993) ("Even if no objections are raised to a fee application, the Court is not bound to award the fees sought, and it has the duty to independently examine the reasonableness of the fees."). The leading Fifth Circuit decision regarding § 330 is *Woerner*. In *Woerner*, the Fifth Circuit joined the majority of circuits in adopting a prospective test for determining whether professional services are compensable, as suggested by the third factor that courts must consider under § 330: "whether the services were necessary . . . or beneficial *at the time at which the service was rendered*." *Id.* at 268, 273–74 (emphasis added). Additionally, the Fifth Circuit provided the following list of factors that bankruptcy courts "ordinarily consider" when weighing this factor:

the probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer or legal firm would have performed in the same circumstances, whether the attorney's services could have been rendered by the Trustee and his or her staff, and any potential benefits to the estate (rather than to the individual debtor).

*Id.* at 276.

*Woerner* reversed the Fifth Circuit's prior retrospective test, under which professionals could only be compensated for services that *actually* resulted in a tangible, identifiable, and material benefit to the estate. *See Pro-Snax*, 157 F.3d at 426. Instead, under the new, prospective test, "[w]hether the services were ultimately successful is relevant to, *but not dispositive of*, attorney compensation." *Woerner*, 783 F.3d at 276 (emphasis added). In sum, the Fifth Circuit held that when read in its entirety, § 330 "permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles—that is, services that were objectively reasonable at the time they were made—even when those gambles do not subsequently (or eventually) produce an 'identifiable, tangible, and material benefit.'" *Id.* at 273–74. If professional services were *either* "'necessary to the administration' of a bankruptcy case or 'reasonably likely to benefit' the bankruptcy estate 'at the time at which [they were] rendered,' *see* 11 U.S.C. § 330(a)(3)(C), (4)(A), then the services are compensable." [5] *Id.* at 276. However, the Fifth Circuit emphasized that its *Woerner* ruling "is not intended to limit courts' broad discretion to award or curtail attorney's fees under § 330, 'taking into account *all* relevant factors.'" *Id.* at 277 (quoting § 330) (emphasis added).

While *Woerner* overturned *Pro-Snax*, it did not disturb the lodestar approach used in assessing fee applications. Indeed, courts within the Fifth Circuit have ordinarily used the lodestar method to calculate the amount of reasonable attorneys' fees. *In re Cahill*, 428 F.3d

---

[5] Hereinafter, in this Opinion, when this Court uses the word "necessary," it will usually be shorthand for "necessary to the administration of this Chapter 11 case." Further, when this Court uses the word "reasonable," it will usually be shorthand for "reasonably likely to benefit this Chapter 11 estate at the time the services were rendered."

536, 539–40 (5th Cir. 2005) (citation omitted).    Under the lodestar method, a court first calculates the compensable hours billed, and then calculates a reasonable hourly rate for the compensable services. *Id.* at 540. The court arrives at the final amount of compensable fees by multiplying the two resulting figures. *Id.* The Supreme Court has emphasized the importance of the lodestar approach in calculating the reasonableness of attorneys' fees, noting that because the method is readily administrable and objective, it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny*, 559 U.S. 542, 552 (2010).

Finally, this Court, after determining the lodestar fee, may consider, in its discretion, whether the resulting lodestar amount should be adjusted upward or downward to account for factors not considered during the lodestar calculation. *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 655 (5th Cir. 2012). In assessing whether an adjustment is appropriate, the Court may consider, among other factors, the twelve factors articulated in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974). These factors are: "(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases." *Id.* at 716. Aside from the twelve *Johnson* factors, the Court may also "consider all relevant factors" in making any adjustment to the lodestar fee. *Woerner*, 783 F.3d at 277.

**C.     Step No. 1 under the Lodestar Approach: Determining Whether all the Hours Billed by the Applicant are Compensable**

The first step in the lodestar method is to evaluate the time entries submitted by the Applicant and determine which are allowable.   This step involves considering whether the services which the Applicant billed were reasonable or necessary.   Because of the prominence of this factor in § 330 and in *Woerner*, the Court weighs this factor most heavily.

1.     Whether the Services Were Reasonable or Necessary

This Court has carefully reviewed the timesheets attached to the Fee Application.   Having identified the services for which the Applicant intends to charge the estate, the Court will now address whether these services were either reasonable or necessary with regard to this Chapter 11 case.

a.     *The Applicant's Timesheets Contain Vague Time Entries and Lumped Time Entries that Lead this Court to Disallow the Fees Associated with These Entries*

The Court finds that several of the entries in the Fee Application are vague, are incomplete, contain insufficient detail, or are "lumped," preventing this Court from determining whether the services were either reasonable or necessary.   The Court will therefore deduct these entries, amounting to 253.9 hours and $71,460.50 in billings, from the total amount that the Applicant requests.

i.     *Vague Time Entries*

Set forth below are a few examples of vague entries. Attached hereto is a chart labeled **Exhibit A** setting forth *all* of the vague entries, the billings for which this Court disallows. The far right column of **Exhibit A** sets forth all of this Court's findings as to why the entries are vague or incomplete. The Court notes that many of these entries assume—incorrectly—that this Court knows the backgrounds and roles of all of the individuals whose names are referenced in

23

the entries.  The result of this incorrect assumption is this Court's denial of all of the requested fees associated with these entries, as this Court simply cannot make a finding that the services described therein were necessary or reasonable. Stated differently, the Court cannot divine who these individuals are and what relationship they have to this Chapter 11 case; the Applicant has the burden of educating this Court about this information, and the Applicant has failed to do so. *Matter of Evangeline*, 890 F.2d at 1326 (explaining that "[t]he applicant bears the burden of proof in a fee application case. The reviewing court should not venture guesses nor undertake extensive investigation to justify a fee for an attorney [] who has not done so himself. It is not an overly burdensome task to enlighten the court as to the work undertaken.").

Time entries that do not provide sufficient detail to determine whether the services described are compensable may be disallowed due to vagueness. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).  Several of the Applicant's time entries are vague. For example, on June 28, 2013, DCB billed 0.7 hours for "Confer with Mr. Rothberg regarding research issues.(.2) Correspondence with Mr. Smith regarding research issues.(.2) Telephone conference with Mr. Smith.(.3)." [Doc. No. 831-1, p. 11].  On September 27, 2013, Harold May (HNM or "May"), an attorney employed by the Applicant, billed 1.8 hours for "Discussion regarding disclosure statement items." [Doc. No. 831-3, p. 89].  Without further information identifying the "research issues" or "disclosure statement items" at issue, this Court cannot determine if these services are reasonable or necessary.  Nor can this Court determine if the services are reasonable or necessary where DCB fails to set forth what the subject of her conference with Smith was  and where May fails to identify with whom he discussed the disclosure statement issues.

Moreover, there are some time entries relating to "review emails" and "exchange emails" without any reference to the recipient or the sender of the emails or what issues the emails concern. For example, on December 9, 2013, HNM billed 0.8 hours for "Discussions and reviewed emails." To merit compensation for time spent on an email, a professional must "identify the participants, describe the substance of the communication, explain its outcome and justify its necessity." *In re Fibermark, Inc.*, 349 B.R. 385, 396 (Bankr. D. Vt. 2006). In other entries, the individual billing for the services set forth either the subject or the participants, but not both. These entries therefore fail to provide the information required to establish that the services were reasonable or necessary.

Nor did the Applicant provide any testimony at the Fee Application hearing about these entries that would assist this Court in determining whether the services were reasonable or necessary. For example, if Rothberg had testified that the emails that HNM reviewed concerned the Debtor's NOL carryforward and that Rothberg used this information to negotiate the Joint Plan, then this Court might well be able to determine that HNM's services were reasonable or necessary. Unfortunately for the Applicant, no such testimony was adduced. *See, e.g.*, *In re Advanced Microbial Solutions, L.L.C.*, 306 B.R. 915, 920 (E.D. Tex. 2004) ("Surprisingly, although witnesses were listed . . . no testimony . . . was presented to the bankruptcy court . . . [p]resentation of such evidence in the form of an affidavit or live testimony is fundamental in presenting an attorney's fee application to a court."); *In re First State Bancorporation*, 2014 WL 1203141, *37 (Bankr. N.M. 2014) ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation. Absent evidence of how and why [the law firm] divided tasks among its attorneys, why it was appropriate for one

partner to routinely review and revise another partner's work, and why it was necessary for both partners to attend and bill for their appearance at hearings, the Court finds that a portion of the requested fees must be disallowed."). Thus, the Applicant has failed to meet its burden of establishing that the services described in **Exhibit A** was either reasonable or necessary.

In total, the Court excludes 42.1 hours, amounting to $13,332.50 in billings, for vague entries. As already noted, **Exhibit A** sets forth all of the vague entries and this Court's findings as to why they are vague.

### ii. Lumped Time Entries

In addition to vague entries, the Fee Application contains several time entries that lump together multiple services without providing the time spent on each discrete task. Like vague entries, lumped entries prevent a court from accurately determining how many hours were reasonably billed. *See In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005) ("When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the Applicant has not met its burden to show that its fees are reasonable."); *In re Saunders*, 124 B.R. 234, 237 n.1 (Bankr. W.D. Tex. 1991) ("In order for the court to determine whether time spent on an activity was reasonable, multiple services cannot be 'lumped' together under one time entry."). Indeed, lumping activities on fee statements violates the U.S. Trustee's Fee Guidelines,[6] and this Court has repeatedly made it known in prior opinions over the past several years that it adheres to these Guidelines and expects the practicing

---

[6] U.S. DEP'T OF JUSTICE, *Guidelines for Reviewing Applications for Compensation (Fee Guidelines)*, JUSTICE.GOV (Feb. 21, 2013 4:50 PM), http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/feeguide.htm. The U.S. Trustee Guidelines expressly state that:

> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a <u>de minimis</u> amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

bar to follow them. *See, e.g.*, *In re Ritchey*, 512 B.R. 847, 870–72 (Bankr. S.D. Tex. 2014); *In re Jack Kline Co., Inc.*, 440 B.R. 712, 752–53 (Bankr. S.D. Tex. 2010); *In re Energy Partners, Ltd.*, 422 B.R. 68, 89 (Bankr. S.D. Tex. 2009).

At least 118 time entries in the Fee Application contain "lumped" activities. For example, on July 18, 2013, DCB billed 6.0 hours for performing five separate tasks: "Draft response to motion to transfer venue and assemble multiple exhibits, revise, research case law and file." [Doc. No. 831-2, p. 17]. What DCB should have done was to record the amount of time she spent *on each of these discrete tasks* so that this Court could assess whether the time spent on each task was reasonable.

DCB was not the only attorney who entered lumped entries on the timesheets. On January 11, 2014, ELR billed the Debtor 3.0 hours for the following services: "Numerous telephone conferences with Art Smith, D. Brown, and C. Power to discuss revised settlement terms. Draft extensive email with comments on structure of the revised proposed settlement." [*Id.* at p. 129]. Again, on January 20, 2014, ELR billed 2.5 hours for four discrete services: "Review email from C. Power with comments on plan and disclosure statement. Telephone conference with C. Power regarding same. Revise plan and disclosure statement. Draft email transmitting same to Mr. Power." [Doc. No. 831-3, p. 103 of 165]. Once again, this Court reiterates that, as with DCB, ELR needed to break out his time on each of the above-described discrete tasks for this Court to assess reasonableness. His failure to do so results in this Court disallowing the fees associated with these entries.

The Court finds the Applicant's lumping particularly egregious considering that Rothberg and Brown are both experienced, board-certified bankruptcy attorneys who should have known that lumping violates the U.S. Trustee's Fee Guidelines. Both are—or should be—familiar with

27

this Court's stance on lumping. *See Ritchey*, 512 B.R. at 872 (holding a bankruptcy professional to a higher standard due to professional's board certification). Indeed, both Rothberg and Brown know how to bill their time correctly—i.e., break out the time spent on each discrete task—because they did so in several instances as evidenced by the timesheet themselves. [*See, e.g.,* Doc. No. 831-1, p. 23 of 50; Doc. No. 831-2, p. 7 of 160] (DCB's time entries stating: "Review objection to DIP Motion.(.1) Assemble rebuttal documents.(.3) Confer with Mr. Rothberg.(.1)"; and "Internet research for general background on Debtor and other parties in litigation (1.0). Continue overview of various pleadings and matters pending in various courts (2.0)." and ELR's time entry stating: "Review objection to DIP loan filed by Rhodes (.3). Prepare for and attend interim DIP Loan hearing.(4.7)."; and subsequent time entries of February 18, 2014 where he broke out his time for one discrete task as taking 0.4 hours and another discrete task taking 1.5 hours).

In sum, the Applicant's lumped entries in the Fee Application amount to 211.8 hours and $58,128.00 in billings. This Court will deduct these time entries because, due to the lumping, the Applicant has not met its burden of proving that the services described therein were reasonable or necessary. Attached hereto is a chart labeled **Exhibit B** setting forth all of the lumped entries, the billings for which this Court completely disallows.

> b. *The 20 Project Categories of Services Described in the Fee Application Contain Certain Entries that are Disallowed, Resulting in this Court's Disapproval of the Fees Associated Therewith*

With regard to the remaining time entries, the Court has examined whether the services rendered were reasonable or necessary according to the twenty project categories into which the Applicant has grouped its services in the Fee Application. Attached hereto as **Exhibit C** is a one-page chart setting forth for each category: (1) the number of hours billed; (2) the amount of

fees requested; (3) the number of hours disallowed; and (4) the amount of fees disallowed. In total, the services that are disallowed—because they were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed— amount to 246.70 hours and $93,132.23 in billings.[7] Attached hereto is a chart labeled **Exhibit D** which breaks out the disallowed time entries for each of the categories that are summarized in **Exhibit C** and discussed immediately below.[8] The far right column of **Exhibit D** sets forth all of this Court's comments and findings as to why the Court is completely disallowing the requested fee associated with each entry.

### i. *Project Category #1: "General, Miscellaneous Services"*

With respect to the services listed in the "General, Miscellaneous" category, the Court finds that these services, with certain exceptions set forth below, were reasonable and necessary.

The Court finds that some of the time entries in the "General, Miscellaneous Services" category involve services that were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed. The Court notes once again that the Applicant provided no testimony at the Fee Application hearing explaining how the services described therein were necessary or reasonable. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish

---

[7] Of the $93,132.23, $67,143.50 represents actual hours billed that this Court is disapproving, and the remaining $25,988.73 represents the percentage reductions that this Court made due to (a) the Applicant's prosecution of the Plan which, as discussed under the "Plan and Disclosure Statements" category, was not a "good gamble;" (b) the reduction relating to the Motion for Procedures (*see* **Exhibit E**); and (c) the reduction relating to the First Interim Fee Application (*see* **Exhibit F**).

[8] **Exhibit D** does not contain the disallowed time entries for two categories: (1) Recap Marketing v. Jaclin Litigation; and (2) Arrayit. The disallowed time entries associated with these two categories are, however, discussed in the main body of this Memorandum Opinion.

the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920.

The Court discusses all of the infirmities in the time entries from the "General, Miscellaneous Services" category on pages 1-28 of **Exhibit D**. A few are discussed below to provide context.

First, on June 27, 2013, DCB billed 4.0 hours for "Meet with Debtor representatives.(1.0) Attend Status Conference to provide litigation strategy update, and hearing on [debtor-in-possession] lending motion(3.)." [Doc. No. 831-2, p. 11 of 160]. For the same reasons this Court denied the Debtor's request for post-petition financing, [Finding of Fact No. 2], this Court finds that the services associated with this request were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed. Specifically, the Applicant's services were not reasonably likely to benefit the estate when performed because the Applicant, as Debtor's counsel prosecuting the motion, did not come close to introducing sufficient evidence for the Debtor to meet its burden of proof on the two issues required to obtain this particular post-petition financing: (1) that the debtor was unable to obtain financing on less onerous terms than those proposed; and (2) that the financing was required to avoid irreparable harm. [Doc. No. 63, pp. 3–4 of 9]. While this Court recognizes that the new standard articulated in *Woerner* is "good gamble"—and no longer an actual, tangible, identifiable, material benefit— this Court concludes that the Applicant cannot satisfy the "good gamble" standard because its courtroom performance at this hearing was woeful. Stated differently, the attempt to obtain financing was not a "good gamble" given the poor preparation and paucity of relevant and convincing testimony that the Applicant adduced at the hearing.

Second, on September 12, 2013, Melissa Haseldon (MMH), an attorney employed by the Applicant, billed 0.10 hours for "Review and approve Notice of Hearing on Motion to Extend Deadline to Provide Proof of Filing Taxes." [Doc. No. 831-2, p. 38 of 160].   For the same reasons this Court denied the Emergency Motion to Extend Deadline on September 19, 2013, [Finding of Fact No. 9], this Court finds that the services associated with this request were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed.   Specifically, at the hearing on the Motion to Extend Deadline, the Applicant, as Debtor's counsel, failed to put forth an acceptable effort to introduce sufficient evidence for the Debtor to meet its burden of proof on the necessity of extending the deadline. [Doc. No. 291].   Stated in *Woerner*'s terms, the effort put forth by the Applicant was not a "good gamble."

Third, there are several time entries relating to the Debtor's subpoena for a Rule 2004 Examination of Robert L. Sonfield, Jr.   [Doc. No. 831-2, pp. 66–67 & 72–73 of 160].   Because the Applicant, on behalf of the Debtor, disregarded the Court's determination at a prior status conference that the 2004 Examination of Robert L. Sonfield, Jr. would take place on December 6, 2013, this subpoena was quashed.   [Finding of Fact No. 12].   Accordingly, the Applicant's services relating to the subpoena for Rule 2004 Examination of Robert L. Sonfield, Jr. were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed.

Fourth, there are several time entries relating to the Notice of Addendum to Amended Settlement and the Addendum, including entries relating to the Emergency Motion to Continue Hearing, which certain parties filed in response to the Debtor's filing of the Addendum. [Finding of Fact No. 15]; [Doc. No. 831-2, pp. 89, 93, 97, 98, 103, 107–09 & 111 of 160].   For

31

the same reasons this Court issued the Order Striking Addendum to Amended Settlement Agreement, [Finding of Fact No. 15], this Court finds that none of the Applicant's services relating to the Addendum were necessary to case administration, nor were they likely to benefit the estate at the time they were performed.  Specifically, the Applicant sprung the addendum at the eleventh hour on all of the parties who were involved in global settlement negotiations, and by doing so, the Applicant sandbagged these parties, which caused the Court to strike the addendum.  The Applicant's actions fomented further mistrust between the Debtor and various active creditors and parties-in-interest, which harmed the estate because it undermined achieving global resolution sooner rather than later.  Stated differently, the Applicant did not make a "good gamble" by filing the Addendum at the last minute.

Fifth, there are six time entries relating to pleadings that were not filed.  Specifically, there are: (1) five entries relating to a motion opposing re-opening discovery for a particular controversy; and (2) one entry relating to a notice of filing certain deposition transcripts.  [Doc. No. 831-2, pp. 123–24 & 129 of 160].  Because the Applicant, during the course of the hearing on this Fee Application, gave no testimony explaining to the Court why these pleadings were never filed—and because the Court has been unable to review these unfiled pleadings to determine how their content benefited the estate—the Court finds that the Applicant has not met its burden of proof of establishing that the services associated with these pleadings were reasonable or necessary.  *Matter of Evangeline*, 890 F.2d at 1326 (explaining that "[t]he applicant bears the burden of proof in a fee application case. The reviewing court should not venture guesses nor undertake extensive investigation to justify a fee for an attorney [] who has not done so himself. It is not an overly burdensome task to enlighten the court as to the work undertaken.").

32

Sixth, there are several time entries relating to the Motion to Approve Selection Process for Independent Director. [Doc. No. 831-2, pp. 141–43 of 160]. Yet, the Debtor withdrew the Motion to Approve Selection Process for Independent Director. [Finding of Fact No. 23]. In light of this fact, the value of the services relating to this motion are not self-evident, and it is the Applicant's burden to prove their value to the Court to be entitled to compensation. *Matter of Evangeline Ref. Co.*, 890 F.2d at 1326. Because the Applicant has failed to do so—indeed, no testimony was adduced about these particular services—the Court cannot find that these services were either necessary to case administration or reasonably likely to benefit the estate at the time they were performed. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920.

In sum, the Court finds that hours billed for the services in the "General, Miscellaneous Services" category that were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed total 30.8 hours, corresponding to $8,098.50 in fees requested, and it is this amount that the Court declines to approve.[9]

> ii.  *Project Category #2: "Schedules and Statements, 341 meeting, and Monthly Operating Reports"*

With respect to the services listed in the "Schedules and Statements, 341 meeting, and the Monthly Operating Reports" category, the Court finds that these services, with certain exceptions set forth below, were reasonable and necessary.

First, there are several time entries relating to the Motion to Seal. [Doc. No. 831-3, pp. 8, 10 & 14–16 of 165]. For the same reasons this Court denied the Motion to Seal, [Finding of Fact

---

[9] *See* Exhibit D, pp. 1–28, for the time entries corresponding to this disallowed amount.

No. 3], this Court finds that the services associated with the request to file its Official Form 26 under seal were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed.  Once again, the Applicant did a poor job of introducing evidence at the hearing on the Motion to Seal; therefore, prosecuting this motion was not a "good gamble." Moreover, at the Fee Application hearing, the Applicant failed to introduce any exhibits or adduce any testimony to alter this conclusion. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, the Applicant is not entitled to compensation for these services.

Second, there are several time entries relating to the Emergency Motion to Extend Deadline.  [Doc. No. 831-3, pp. 24–26 of 165].  For the same reasons this Court denied the Emergency Motion to Extend Deadline, [Finding of Fact No. 9], this Court finds that the services associated with extending the deadline to provide proof of filing the 2012 tax return were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed.  Specifically, the Applicant did not do a good job at the hearing of adducing testimony to establish that cause existed to extend the deadline.  Moreover, the Applicant did not provide any testimony at the hearing on the Fee Application to convince this Court that the attempt to obtain approval of the Emergency Motion to Extend Deadline was a "good gamble" at the time the Applicant prosecuted this motion.  *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish

the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, the Applicant is not entitled to compensation for these services.

In sum, the Court finds that the fees for the services in the "Schedules and Statements, 341 meeting, and the Monthly Operating Reports" category that were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed total 26.5 hours, corresponding to $7,038.00 in fees requested, and it is this amount that the Court declines to approve.[10]

### *iii.   Project Category #3: "Professionals"*

With respect to the services listed in the "Professionals" category, the Court finds that these services, with certain exceptions set forth below, were reasonable and necessary. However, the Court finds that several of the time entries in the "Professionals" category involve services that were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed.

First, several time entries involve services relating to the Application to Employ Public Accountant.  [*Id.* at pp. 47, 52–57, 63 & 64].   For the same reasons this Court denied the Debtor's request to employ Carlos Lopez and LBB & Associates, Ltd., LLP, [Finding of Fact No. 6], this Court finds that the services associated with this particular application were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed. Once again, the Applicant did a poor job of introducing evidence at the hearing on the Motion to Employ Public Accountant; therefore, prosecuting this motion was not a "good gamble." Moreover, at the Fee Application hearing, the Applicant failed to introduce any exhibits or adduce any testimony to alter this conclusion. *First State Bancorporation*, 2014

---

[10] *See* Exhibit D, pp. 29–59, for the time entries corresponding to this disallowed amount.

WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, the Applicant is not entitled to compensation for these services.

Second, there are several time entries relating to the Debtor's efforts to employ a special corporate and securities counsel and the application to employ David M. Loev and The Loev Law Firm. [Doc. No. 831-3, pp. 49, 59, 60 & 62 of 165]. Because the Debtor later withdrew its Application to Employ SEC Counsel, [Finding of Fact No. 8], the value of the related services is not obvious to this Court. Nor did the Applicant provide any testimony to demonstrate the value of these services; therefore, the Court cannot find that they were either necessary to case administration or reasonably likely to benefit the estate at the time they were performed. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Because the Applicant has failed to meet its burden that these services were necessary or reasonable, the Applicant is not entitled to compensation for these services.

Third, the Court finds that two entries on September 17, 2013 should be excluded. Specifically, ELR billed 1.00 hours for "Conference with R. Remy regarding potential retention as corporate/securities counsel," and DCB billed 2.00 hours for "Meeting with Mr. Rothberg and Mr. Remy regarding potential employment as SEC attorney and receive his feedback on transaction." [Doc. No. 813-3, p. 63 of 165]. Ultimately, however, Mr. Remy was not hired as

an SEC attorney; therefore, to be paid, the Applicant needed to explain to the Court how these discussions were necessary to case administration or likely to benefit the estate. Having given no testimony on this point, the Applicant is not now entitled to compensation for these services. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920.

Fourth, the Court finds that none of the time entries relating to the application to employ a tax accountant, totaling 5.1 hours and $1,476.50 in billings, are compensable. [Doc. No. 831-3, pp. 78 & 79 of 165]. The Applicant (on behalf of the Debtor) never filed any such application, and therefore, to be compensated for preparing one, the Applicant needed to explain to the Court why the related services were reasonable or necessary. Having failed to provide any testimony on these entries, the Applicant has failed to meet its burden of proof to establish these services as compensable. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. The Applicant is therefore not entitled to compensation for these services.

Fifth, the Applicant billed a total of 5.70 hours for services relating to the Motion for Procedures, corresponding to $1,650.50 in fees. Attached hereto as **Exhibit E** is a chart showing the time entries related to the Motion for Procedures. For the same reasons the Motion for Procedures was denied in part, [*See* Finding of Fact No. 5], the Court finds that compensation for services related to the Motion for Procedures should be denied in part. More specifically, the

Court denied that part of the Motion for Procedures in which Applicant requested that 80% of its requested fees and 100% of its requested expenses be automatically approved each month if no objection was lodged.  [*See* Doc. No. 79, 4¶11].  The Court denied this request because of the unusually contentious nature of the instant Chapter 11 case. The Applicant knew—or should have known—that it was highly likely that one or more parties (including, but not limited to, those now objecting to the Fee Application) would indeed object to the Applicant receiving virtually all of its requested fees and expenses each month.  Indeed, Rhodes Holdings, LLC did in fact lodge an objection, [Doc. No. 145], and its counsel made persuasive arguments at the hearing on this motion. If the Court had granted all of the relief sought in the Motion for Procedures, there is no doubt—either now or at the time the Applicant filed this motion—that monthly objections to the fee and expense reimbursement requests would have been lodged, resulting in, at a minimum, at least one lengthy and acrimonious hearing each month. And, it is important to note, the hearing would <u>not</u> have primarily concerned obtaining a confirmed plan to pay all creditors, but rather determining what interim amounts to pay to one creditor—i.e., the Applicant. Given that an express Code provision (i.e., § 331) establishes that the general rule for applying for payment of interim compensation of professionals is once every 120 days, it was unreasonable for the Applicant to draft and prosecute the Motion for Procedures in the extra-adversarial milieu of this case, evident since its onset. Stated differently, it was unreasonable for Applicant to believe that such a request would benefit the estate.  In *Woerner*'s lexicon, it was not a "good gamble."

Furthermore, seeking such relief was unnecessary to the administration of this Chapter 11 case; at least, the Applicant, at the hearing on the Motion for Procedures, provided no evidence that complying with the normal 120-day rule would impose a serious financial hardship. *In re*

38

*Commercial Financial Services, Inc.*, 231 B.R. 351, 357 (Bankr. N.D. Okla. 1999) ("Section 331 permits the Court to grant leave to file more frequent interim applications for compensation and reimbursement. This Court will permit such relief to professionals who present credible evidence that complying with the 120-day rule will impose serious financial hardship.").

Accordingly, because the Court finds that half of the relief requested in the Motion for Procedures was neither necessary to case administration nor likely to benefit the estate, the Court finds that half of the services relating to this motion were similarly neither necessary nor reasonable. Consequently, the Court will disapprove one-half of the hours billed for these services to be used in calculating the Applicant's fee (i.e., $1,650.50 / 2 = $825.25). Accordingly, the Court disapproves fees in the amount of $825.25.

Sixth, the Fee Application includes a total of 35.7 hours related to preparing the First Interim Fee Application, corresponding to fees of $5,713.50. Attached hereto as **Exhibit F** is a chart showing the time entries in the pending Fee Application related to the First Interim Fee Application. Yet, this Court did not approve the First Interim Fee Application in its entirety. The Applicant requested attorneys' fees and expenses in the amount of $326,395.20, but the Court authorized the Debtor to pay the Applicant a total of $289,300.70 in attorneys' fees and expenses[11] (i.e., 88.7% of the requested fees and expenses). [Finding of Fact No. 10]. As set forth in the Court's Order on the First Interim Fee Application, the Court denied fees for services relating to motions that it had either denied due to the Applicant's woeful presentation of evidence or that the Applicant had withdrawn. [Doc. No. 406]. Under the retrospective test of *Pro-Snax* that governed at that time, it was clear that services related to these motions had not provided an identifiable, tangible, and material benefit to the estate; thus, the Applicant should have known that it could not collect fees from the estate for services related to these motions. *See*

---

[11] The amount of $289,300.70 represents the sum of $264,357.50 in fees and $24,943.20 in expenses.

*Pro-Snax*, 157 F.3d at 426.  And, if *Woerner* had been applicable at this time, this Court still would have denied fees for services relating to the same motions because prosecuting those motions were not "good gambles"—which in turn means that the Applicant could not collect fees for the services rendered relating to these motions.

Under these circumstances, the Court finds that it should not now award the entire $5,713.50 of time that the Applicant spent prosecuting the First Interim Fee Application.  Rather, it should award 88.7% of this amount because this is the percentage of fees and expenses that the Court approved for that specific interim application.  Stated differently, the Court now deducts 11.3% of the $5,713.50, as 11.3% represents the amount that the Court disallowed in the First Interim Fee Application.  Therefore, with respect to the Fee Application presently pending, the Court finds that $645.63 (i.e., $5,713.50 x 0.113) of the fees relating to the First Interim Fee Application should be disallowed.  Attached hereto as **Exhibit F** is a chart showing those time entries related to the First Interim Fee Application.

Finally, there are several time entries relating to the preparation of the Herrera Fee Application and the Amended Herrera Fee Application, [*see* Finding of Fact No. 17], including communications with Herrera about his fee applications.  [Doc. No. 831-3, pp. 63, 65, 71, 72, 74 & 76 of 165].  The Court finds that these services were neither necessary to the administration of the case nor reasonably likely to benefit the Debtor's Chapter 11 estate at the time they were rendered because the Applicant—in this highly-charged case—should not be representing the Debtor's professional (i.e., Herrera), and then charging the Debtor's estate for that representation.  Rather, Herrera should have sought his own counsel to assist him in preparing his fee applications.[12]  *But see In re 1002 Gemini Interests LLC*, No. 11-38815, 2015 WL

---

[12] Herrera did, in fact, eventually retain his own counsel, who represented him at the hearing on the Herrera Fee Application.  [*See* Doc. Nos. 859 & 874].

913542, at *4 (Bankr. S.D. Tex. Feb. 27, 2015) (granting an examiner fees for defending other professionals' fee applications). Moreover, Herrera himself also billed the Debtor 15.1 hours for a total of $5,285.00 for preparing his fee applications, [Doc. No. 826-1, p. 33 of 166], so there was double billing to some extent. Finally, the Court finds that, for the same reasons it denied the Herrera Final Fee Application in full, [Finding of Fact No. 17], the Applicant's services related to the Herrera Final Fee Application were not necessary to case administration, nor were they reasonably likely to benefit the estate at the time they were performed. Indeed, this Court issued a lengthy memorandum opinion explaining its findings and conclusion as to why Herrera provided no benefit to the estate. *Digerati Technologies, Inc.*, 524 B.R. 673.

In sum, the Court finds that the services under the "Professionals" category that were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed total 38.4 hours and $10,607.88 in fees requested, and it is this amount that the Court declines to approve.[13]

### iv. Project Category #4: "Plan and Disclosure Statements"

The Applicant seeks a total of $245,178.50 for services rendered in the "Plan and Disclosure Statement" category. This Court's review of the time entries reflects that the Applicant spent substantial time thinking about and working on numerous drafts of plans, amended plans, disclosure statements, and amended disclosure statements—some, but not all, of which were actually filed. This Court must now determine how many hours of services related to the Debtor's proposed plans and disclosure statements are compensable.

"Counsel for a debtor or debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation." *In re Phillips*, 291 B.R. 72,

---

[13] *See* Exhibit D, pp. 60–121, for the time entries corresponding to the disallowed amount of $9,137.00. This figure is then added to the percentage reduction referenced in **Exhibit E** ($825.25) and **Exhibit F** ($645.63) to arrive at the figure of $10,607.88 representing the amount of fees disallowed in the "Professionals" category.

82 (Bankr. S.D. Tex. 2003); *see also In re Saturley*, 131 B.R. 509, 521 (Bankr. D. Me. 1991) ("[F]utile efforts aimed at achieving unattainable objectives are unreasonable. Fees generated in tilting at windmills will be disallowed."). A percentage downward adjustment is appropriate when a professional's unreasonable efforts to confirm a plan brought no benefit to the estate. *See, e.g., In re Nwokedi*, No. 12-32759, 2014 WL 4199106, at *3 (Bankr. S.D. Tex. Aug. 22, 2014). In *Nwokedi*, the professional sought compensation for work done on a plan and disclosure statement regarding which she had never consulted with any estate creditors. *Id.* at *6. Unsurprisingly, the plan was not confirmed. *Id.* Because of the professional's unsuccessful attempts to confirm the plan, as well as her unsuccessful, unreasonable efforts related to a claim objection, the bankruptcy court adjusted the fees downward by 25%. *Id.*

In the case at bar, the Applicant prosecuted an arrogant plan that drew vigorous objection and which this Court denied without the Applicant even concluding its case in chief at the confirmation hearing. [*See* Finding of Fact No. 22]. The Plan, which was drafted by the Applicant, proposed that Smith and Estrada become the sole directors of the Reorganized Debtor and receive exorbitant compensation packages. [*See* Doc. No. 731]. This Court denied confirmation of the Plan because it proposed the appointment of officers and directors of the reorganized Debtor (i.e., Smith and Estrada)—which was not "consistent . . . with public policy" as required by § 1129(a)(5)(A)(ii), *Digerati Technologies, Inc.*, 2014 WL 2203895 at *5. Indeed, Smith himself did not understand all of the terms of the Plan, and the Plan proposed exorbitant compensation packages for both Smith and Estrada. In *Woerner*'s terms, the Applicant's attempt to obtain confirmation of the Plan was not a "good gamble."

After this Court denied the confirmation of the Debtor's Plan, the attorneys for these individuals obtained authorization from them to take charge of negotiating, filing, and taking the

lead role in obtaining confirmation of the Joint Plan. [Finding of Fact No. 25]. Indeed, these secured creditors, in order to at least recover some of the indebtedness owed to them by the Debtor, agreed to a joint plan that they knew might well lead to the sale of their collateral (i.e., the two subsidiaries) for less than 100% of the outstanding debt owed to them. And, in fact, after the Joint Plan was confirmed, these two subsidiaries were ultimately sold for approximately two-thirds of the amount of the debt secured by the stock of these two entities. [Doc. Nos. 910 & 910-1, p. 4 of 28]; [Doc. Nos. 929 & 929-1, p. 3 of 22]. Thus, while facially a success, the result the Debtor obtained through its Chapter 11 case did not go according to the Debtor's "plan or intent," as Smith, the CEO of the Debtor, testified at the outset of the case—which was for the Debtor's investment banker, Herrera, to sell the Debtor's subsidiaries for a sum sufficient to pay both the secured and unsecured creditors in full. [App. to Employ Investment Banker Hr'g Tr. 5:25–6:6, July 10, 2013].[14] This Court has already detailed Herrera's failure to achieve this goal, as well as the incestuous relationship between the Applicant and Herrera, in its memorandum opinion *In re Digerati Technologies, Inc.*, 524 B.R. 666 (Bankr. S.D. Tex. 2015).

Under the circumstances described above, this Court finds it appropriate to impose a reduction of the fees requested by the Applicant for this "Plan and Disclosure Statement" category. As already noted, the Applicant's prosecution of the Plan was simply not a "good gamble." The question is how much of the requested fees should be reduced? After this Court denied confirmation of the Plan on February 11, 2014, the Applicant did still assist in negotiating the Joint Plan, which was confirmed. [Finding of Fact Nos. 24 & 25]. And, indeed, the Joint Plan resulted in payment of all unsecured claims, if not payment of all secured claims. The

---

[14] Not only did Smith testify that the Debtor's intent was to sell the two subsidiaries in order to generate sufficient funds to pay *all* creditors in full; Herrera testified that the sale of the Hurley Enterprises subsidiary *alone* "would be in the range of 50 to $55 million, which would be almost enough to take care of all the Creditors . . . ." [Hr'g Tr. 12:19–13:2, July 10, 2013].

Applicant estimates that 90% of the provisions in the Plan were incorporated into the Joint Plan. [Doc. No. 1127, p. 3]. After comparing the Debtor's proposed plan that this Court did not confirm (i.e., the Plan) to the Joint Plan, the Court agrees. The Court has also compared the Debtor's proposed disclosure statements with the Final Disclosure Statement, and finds that 90% of the proposed disclosure statements was also incorporated into the Final Disclosure Statement; indeed, this Court conditionally approved the Debtor's First Amended Disclosure Statement, [Finding of Fact No. 18]. Thus, the Court finds that the Applicant's services in this respect did provide a benefit to the estate. The Applicant's conduct in the case at bar is simply not as egregious as the conduct of the Debtor's counsel in *Nwokedi*.

However, the Court further finds that the remaining 10% of the plans and disclosure statements that the Applicant actually filed did not appear reasonably likely to benefit the estate when filed; this is so because, for example, these documents contained provisions that would have vested control of the reorganized Debtor solely with the pre-petition officers (who did not entirely comprehend the mechanics of the Plan) and that would have compensated these individuals to an excessive degree.[15]   [*See* Doc. No. 731, Plan Ex. 5 (the Debtor proposed to assume the management contracts of Smith and Estrada)]. The Applicant knew, or should have known, that the Plan would draw vigorous objection—which it did, [Doc. No. 699],—and that attempting to obtain confirmation of the Plan with these onerous terms would not be a "good gamble."

---

[15] In its order denying confirmation of the Plan, this Court wrote the following: "This Court also has questions about the competence of Smith. During his testimony, it became clear to this Court that Smith does not understand many of the provisions of the Plan. Indeed, at one point during the hearing when Smith was unable to answer a question about a provision of the Plan, one of the attorneys representing the Debtor, Ed Rothberg, informed the Court that he (i.e., Rothberg) had listed himself as a witness so that he could give testimony about the Plan's meaning and implementation. While such a trial strategy is not prohibited, it is nevertheless disconcerting that the CEO of the Debtor—who is to be handsomely rewarded monetarily if the Plan is confirmed—cannot satisfactorily explain important provisions of the Plan." [Doc. No. 739, p. 9 of 11].

In sum, the Court finds that 10% of the content of the Debtor's proposed plans and disclosure statements (i.e., those that were drafted and actually filed) was neither reasonable nor necessary, while 90% was reasonable and necessary, and therefore was eventually incorporated into the Joint Plan and Final Disclosure Statement. Under these circumstances, the Court finds that it is appropriate to disallow 10% of the Applicant's requested amount of $245,178.50— which means that the disallowed amount is $24,517.85. If the analysis stopped here, then this Court would simply find that $220,660.65 is the allowed amount for services that the Applicant rendered in the "Plan and Disclosure Statements" category.

However, the analysis does not stop here. The reason is that there are entries relating to a "third amended plan" and a "second amended disclosure statement," [Doc. No. 831-3, pp. 131–32 of 165], and yet the Applicant never filed a third amended plan nor a second amended disclosure statement on the Debtor's behalf. Indeed, the last plan that the Applicant actually filed was entitled a "second amended" plan (defined as the Plan and denied by this Court on February 11, 2014). [Finding of Fact No. 22]. The last disclosure statement filed by the Applicant was the First Amended Disclosure Statement, which this Court conditionally approved on January 21, 2014. [Finding of Fact No. 18]. Therefore, the Court is unable to determine whether the language in the unfiled, third amended plan and the unfiled, second amended disclosure statement were actually incorporated into the Joint Plan and Final Disclosure Statement; and, there was no testimony from the Applicant on this issue at the hearing on the Fee Application. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Accordingly, this Court is

unable to find that the services relating to a "third amended plan" and a "second amended disclosure statement" were either necessary to the administration of the case or reasonably likely to benefit the estate at the time they were performed.

The time entries relating to the "third amended plan" and the "second amended disclosure statement" show that services were rendered on February 13 and 14, 2014 by ELR, MSK, and DCB. [Doc. No. 831-3, pp. 131−33 of 165]. These entries are set forth on **Exhibit G.** These entries total 15.7 hours, equating to fees of $5,343.50. Thus, this amount must be deducted from the amount of $220,660.65, which results in an amount totaling $215,317.15. It is this amount that the Court finds should be allowed for services rendered in the "Plan and Disclosure Statements" category.

### v.  Project Category #5: "Executory Contracts"

The Court finds that the services rendered by the Applicant in the "Executory Contracts" category were reasonable and necessary at the time that they were rendered. Specifically, it was necessary for the Applicant to review the executory contracts that the Debtor had on the date of the filing of its Chapter 11 petition. The Debtor, in consultation with the Applicant, had to make a determination of which contracts to assume and which ones to reject. Although this Court did not confirm the Plan proposed by the Debtor, it did confirm the Joint Plan; and the Joint Plan assumed and rejected most of the contracts that the Plan had proposed be assumed and rejected (with the notable exception that the Joint Plan rejected the employment agreements of Smith and Estrada, whereas the Plan proposed that these agreements be assumed). [*Compare* Exs. 5 & 6 of the Plan (Doc. No. 708) to Exs. 5 & 6 of the Joint Plan (Doc. No. 795-1)]. Stated differently, the Applicant's review of the Debtor's executory contracts was beneficial to the estate because the proponents of the Joint Plan were able to prosecute the Joint Plan by knowing which executory contracts to assume and which ones to reject. For these reasons, the Court finds that the 3.4

hours billed by the Applicant reviewing these executory contracts (which equates to $1,240.00) was beneficial to the estate and should be approved.

### vi.  Project Category #6: "Lift Stay"

The Court finds that the services rendered by the Applicant in the "Lift Stay" category were reasonable and necessary at the time that they were rendered. Specifically, the Applicant, on behalf of the Debtor, objected to two attempts by Rhodes Holdings, LLC, Robert C. Rhodes, William E. McIlwain, Robert L. Sonfield, Jr., and Sonfield & Sonfield, P.C. to lift the stay with respect to certain proceedings pending in the 14th Court of Appeals of Texas. [*See* Doc. Nos. 122, 152, 159, 166, 231, 249 & 263]. In the first instance, the Applicant was entirely successful at obtaining an order from this Court denying the request to lift the stay due to the failure of the movant to comply with the applicable Bankruptcy Local Rules. [Doc. No. 212]. In the second instance, the Applicant provided a benefit to the estate insofar as this Court issued an order denying a lifting of the stay to prohibit any non-debtor party in the appeal pending in the 14th Court of Appeals from prosecuting a derivative claim that belonged solely to the Debtor. [Doc. No. 276].  For these reasons, the Court finds that the services totaling 38.3 hours billed by the Applicant opposing these two motions to lift stay (which equates to $9,085.00) were beneficial to the estate and should be approved.

### vii.  Project Category #7: "Asset Disposition"

The Court finds that the services rendered by the Applicant in the "Asset Disposition" category, with one exception, were reasonable and necessary at the time that they were rendered. The exception concerns services rendered relating to preparation of a non-disclosure agreement. [Doc. No. 831-4, pp. 13, 15, 20–21, 30–31, 33 & 44 of 197].  This Court, at a hearing held on December 4, 2013, found that no non-disclosure agreement was in existence. [Finding of Fact No. 14].  Without a non-disclosure statement in existence or further detail about the services

rendered relating to this document, the Court is unable to determine whether the Applicant's services were necessary to the administration of the case or reasonably likely to benefit the estate at the time they were performed. Indeed, the Applicant did not provide any testimony in connection with this Fee Application to justify the value of these services. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, the Applicant is not entitled to compensation for these particular services.

In sum, the Court finds that the services in the "Asset Disposition" category that were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed total 2.2 hours and $842.50 in fees requested, and the Court will not approve the fees associated with these services.[16]

### viii.   Project Category #8: "Claims"

The Court finds that the services rendered by the Applicant in the "Claims" category, with four exceptions, were reasonable and necessary. The first exception concerns services rendered relating to an objection to The Venturebanc, Inc.'s proof of claim. [Doc. No. 831-4, pp. 72–73 & 77–79 of 197]. After reviewing the Claims Register and the docket sheet, the Court finds that the Debtor has never filed such an objection; indeed, The Venturebanc, Inc. has never filed a proof of claim in this case. At the hearing on the Fee Application, the Applicant provided no testimony to explain how these particular services were necessary or beneficial to the estate. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee

---

[16] *See* Exhibit D, p. 122–24, for the time entries corresponding to this disallowed amount.

Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, this Court finds that the services relating to an objection to The Venturebanc, Inc.'s proof of claim were not necessary to the administration of the case, nor were they likely to benefit the estate at the time they were performed.

The second exception concerns services rendered by the Applicant relating to a proof of claim filed by Harris County. [Doc. No. 831-4, p. 74 of 197]. After reviewing the Claims Register, the Court finds that Harris County has never filed a proof of claim; therefore, this Court finds that the services relating to Harris County's proof of claim were not necessary to the administration of the case, nor did they benefit the estate at the time they were performed. Indeed, at the hearing on the Fee Application, the Applicant provided no testimony to explain how these particular services were necessary or beneficial. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920.

The third exception concerns services rendered relating to the withdrawal of Smith and Estrada's proofs of claim, including communications to Smith and Estrada. [Doc. No. 831-4, p. 74, 76, 77 & 80 of 197]. Smith and Estrada should have consulted their own respective attorneys, and not the Debtor's counsel, regarding whether to withdraw their respective proofs of claims. Moreover, there are two time entries relating to the preparation of notices of withdrawal of the claims of Smith and Estrada. [*Id.* at p. 74]. These two notices were never filed, and Smith and Estrada have never withdrawn their proofs of claim. Moreover, the Applicant provided no

testimony about how the services relating to the notices of withdrawals were necessary or benefited the estate. *First State Bancorporation*, 2014 WL 1203141, at \*37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Therefore, this Court finds that the services relating to the withdrawal of Smith and Estrada's proofs of claim were neither necessary to the administration of the case, nor were they likely to benefit the estate at the time they were performed.

Finally, the fourth exception concerns services rendered relating to an objection to proof of claim no. 3 filed by a Dr. Roqueni. [Doc. No. 831-4, pp. 73 & 77 of 197]. Unlike The Venturebanc, Inc., Dr. Roqueni actually filed a proof of claim. [Claims Register, Claim No. 3]. However, the Debtor never filed an objection to his proof of claim. Without an explanation as to why the claim objection was never filed, the Court is unable to determine whether the services relating to Dr. Roqueni's proof of claim were either necessary to the administration of the case or reasonably likely to benefit the estate at the time they were performed. Therefore, this Court finds that the services relating to Dr. Roqueni's proof of claim were neither necessary nor reasonable. Accordingly, the Court finds that the fees associated therewith should be disallowed.

In sum, the Court finds that the services in the "Claims" category that were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed total 17.9 hours and $3,337.50[17] in fees requested, and the Court will not approve the fees associated with these services.

---

[17] *See* Exhibit D, pp. 125–39, for the time entries corresponding to this disallowed amount.

*ix.  Project Category #9: "DIP Financing"*

For the same reasons this Court denied the Debtor's two requests for post-petition financing, [Findings of Fact Nos. 2 & 4], this Court finds that the services relating to these requests as set forth in the "DIP Financing" category were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed. Specifically, the Applicant's services were not reasonably likely to benefit the estate when performed because the Applicant put forth a woeful effort in first attempting to show that the financing requested was necessary to avoid irreparable harm to the estate, [Doc. No. 63], and later attempting to show that the financing was necessary to pay line item expenses that could not be explained or that were unnecessary. [Doc. No. 156]. Stated differently, due to the Applicant's failure to introduce sufficient evidence, there was no chance that the Debtor would be able to obtain post-petition financing. In *Woerner*'s lexicon, the Applicant's efforts did not rise to the level of being a "good gamble."

The Court also notes that some of the time entries in the DIP Financing category relate to the Motion to Seal. For the same reasons the Court denied the Motion to Seal, [Finding of Fact No. 3], the Court also finds these services were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed.

In sum, the Court finds that all of the services in the "DIP Financing" category—which total 97.5 hours and $29,585.50—should be disapproved.[18]

*x.  Project Category #10: "Digerati v. Sonfield Litigation"*

The Court finds that the services rendered by the Applicant in the "Digerati v. Sonfield Litigation" category, with certain exceptions, were reasonable and necessary. This suit was an

---

[18] *See* Exhibit D, pp. 140–273, for the time entries corresponding to this disapproved amount.

asset of the estate that the Debtor prosecuted against several individuals and entities, many of whom are the Objectors to this Fee Application. Prosecution of this suit was beneficial to the estate because it kept pressure on the defendants, which in turn kept them at the negotiating table with the Debtor and other creditors and parties-in-interest—eventually resulting in all of these parties filing and obtaining confirmation of the Joint Plan. [Finding of Fact No. 25].

The exceptions concern services rendered relating to the Motion to Clarify. [Doc. No. 831-4, pp. 106–07 of 197]. For the same reasons this Court denied the Motion to Clarify, [*see* Finding of Fact No. 7], this Court finds that the services relating to the Motion to Clarify were neither necessary to case administration nor were reasonably likely to benefit the estate at the time they were performed. Specifically, it was not a "good gamble" for the Applicant to file the Motion to Clarify when no clarification was needed.

In sum, the Court finds that the services in the "Digerati v. Sonfield Litigation" category that were neither necessary to case administration nor likely to benefit the Debtor's estate when performed total 7.5 hours and $1,374.00 in fees requested, and thus the Court declines to approve the fees associated with these particular services.[19]

*xi. Project Category #11: "Digerati v. Oleum Capital Litigation"*

The Court finds that the services rendered by the Applicant in the "Digerati v. Oleum Capital Litigation" category were reasonable and necessary. This was a suit initiated in Nevada prior to the filing of the Debtor's Chapter 11 petition; it was an asset of the estate. However, the Debtor did *not* want the suit to be prosecuted because it had been filed at the behest of the board of directors whose authority the Debtor disputed. Stated differently, the Debtor believed that prosecution of this suit would harm, not benefit, the estate. The Debtor therefore took steps to

---

[19] *See* Exhibit D, pp. 274–80, for the time entries corresponding to this disallowed amount.

obtain dismissal of the suit, and succeeded in doing so. This Court finds that the services rendered by the Applicant were both necessary to the administration of this Chapter 11 estate and, additionally, beneficial to the estate at the time the services were rendered. If the Debtor had not taken action to dismiss this suit, then the parties in that suit would still be mired in depositions and document production in Las Vegas, and it is highly doubtful that the Joint Plan would have been confirmed in this case—which, in turn, means that no claims would have been paid.

### xii.   Project Category #12: "Rhodes Holdings v. Gorham Litigation"

The Court finds that the services rendered by the Applicant in the "Rhodes Holdings v. Gorham Litigation" category were reasonable and necessary. This suit involved several of the Objectors, who were prosecuting derivative causes of action that belonged to the Debtor, not to them individually. These derivative causes of action were property of the estate that only the Debtor, not these individuals, had standing to prosecute. The Debtor therefore removed the suit initiated by the Objectors to this Court, and this Court then ruled that only the Debtor could prosecute these derivative claims. Therefore, this Court approves all of the requested fees of $69,576.50 in this category.

### xiii.   Project Category #13: "Sonfield v. Albeck Litigation"

The Court finds that the services rendered by the Applicant in the "Sonfield v. Albeck Litigation" category, with one exception, were reasonable and necessary. The Debtor was one of the defendants in this suit brought by Robert L. Sonfield, Jr. and Robert L. Sonfield, P.C., who are two of the Objectors to the Fee Application. The Debtor removed this suit to this Court and obtained an order preventing the prosecution of any claims against the Debtor thereafter. These actions benefitted the estate because they allowed the Debtor to focus on reorganization and eventually helped to obtain confirmation of the Joint Plan.

The one exception concerns services rendered relating to the Motion to Clarify. [Doc. No. 831-4, p. 186 of 197]. For the same reasons this Court denied the Motion to Clarify, [Finding of Fact No. 7], this Court finds that the services relating to the Motion to Clarify were neither necessary to case administration nor reasonably likely to benefit the estate at the time they were performed. Specifically, it was not a "good gamble" for the Applicant to file the Motion to Clarify when clarification was not needed.

In sum, the Court finds that the services in the "Sonfield v. Albeck Litigation" category that were neither necessary to case administration nor reasonably likely to benefit the Debtor's estate when performed total 2.9 hours and $549.00 in fees requested, and the Court will not approve these particular fees.[20]

### xiv.    Project Category #14: "Recap Marketing v. Jaclin Litigation"

The Fee Application provides a skeletal background of this litigation: "Applicant has monitored this lawsuit after filing its Suggestion of Bankruptcy, ensuring that the automatic stay against Debtor had not been violated." [Doc. No. 831, p. 31 of 55]. This "bare bones" discussion does not help the Court in assessing whether the services rendered by the Applicant were necessary or reasonable. Nor did the Applicant adduce any testimony or introduce any exhibits at the hearing on the Fee Application to educate the Court as to just exactly what this litigation entailed. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Accordingly, the Court finds that the Applicant has failed to satisfy its burden of proving that the services were

---

[20] *See* Exhibit D, pp. 281–87, for the time entries corresponding to this disallowed amount.

either necessary or reasonable, and therefore the Court disallows all of the requested fees of $1,673.00 associated with this category.

### xv.   Project Category #15: "14th Court of Appeals"

The Court finds that the services rendered by the Applicant in this category were reasonable and necessary. This Court, in its order of August 9, 2013, [Adv. Pro. No. 13-03118, Adv. Doc. No. 43], had remanded certain direct claims of non-debtor parties to the Harris County District Court, but did not remand derivative claims belonging to the Debtor. A dispute thereafter arose as to whether the non-debtor parties were taking positions in the Harris County District Court and in the 14th Court of Appeals that could be construed as prosecuting derivative claims belonging to the Debtor. This Court therefore held a hearing on September 10, 2013, and issued an order on the same day, [Doc. No. 276], delineating what actions could take place in the state court system and what avenues were available to the Debtor if any state court issued a ruling that the claim being prosecuted was a derivative claim. The Applicant's services in this respect—which totaled 3.5 hours—were beneficial to the estate because they ensured that no party, except the Debtor, would prosecute a derivative claim. Accordingly, the Court finds that the requested fees of $741.00 are approved.

### xvi.   Project Category #16: "Arrayit"

The Fee Application provides a skeletal background of this litigation: "Applicant investigated the connection and similarities between the Debtor's November 26 Transaction and a contemplated business combination/merger between Arrayit and Avant Diagnostics around the same time which also contemplated an equity line facility. Some of the parties involved in the Arrayit transaction were also involved in the November Transaction with the Debtor." [Doc. No. 831, p. 32 of 55]. This "bare bones" discussion does not help the Court in assessing whether the services rendered by the Applicant were necessary or reasonable. Nor did the Applicant adduce

any testimony or introduce any exhibits at the hearing on the Fee Application to educate the Court as to just exactly what this matter specifically entailed. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Accordingly, the Court finds that the Applicant has failed to satisfy its burden of proving that the services were either necessary or reasonable, and therefore the Court disallows the requested fees of $165.00 associated with this category.

### xvii. Project Category #17: "Dishon & Hurley v. Special Waste"

The Court finds that the services rendered by the Applicant in this category were reasonable and necessary. The Applicant rendered services reviewing a complaint to void a certain contract that needed to be eliminated in order to facilitate a sale of one of the subsidiaries owned by the Debtor. The Applicant's services in this respect were beneficial to the estate because they kept tabs on a certain contract that had the potential to negatively affect the sale of one of the Debtor's subsidiaries and therefore negatively affect payment of claims in this Chapter 11 case. Accordingly, the Court finds that the requested fees of $400.00 for this category are approved.

### xviii. Project Category #18: "Perfect Circle"

The Court finds that the services rendered by the Applicant in this category were reasonable and necessary. The Applicant rendered services reviewing a complaint to void a certain contract that needed to be eliminated in order to facilitate a sale of one of the subsidiaries owned by the Debtor. The Applicant's services in this respect were beneficial to the estate at the time rendered because they kept tabs on a certain contract that had the potential to negatively affect the sale of one of the Debtor's subsidiaries and therefore negatively affect payment of

claims in this Chapter 11 case. Accordingly, the Court finds that the requested fees of $330.00 for this category are approved.

### xix. Project Category #19: "Appeal (Venue)"

The Court finds that the services rendered by the Applicant in this category were reasonable and necessary. After a lengthy hearing at the beginning of this case as to whether venue should be transferred to the U.S. Bankruptcy Court for the Western District of Texas, this Court denied the request to transfer venue and kept the case in the Southern District of Texas— as the Debtor had requested. The losing parties in this dispute filed a notice of appeal, and therefore the Applicant, on behalf of the Debtor, had to render services as the appellee in order to make any argument at the appellate court level that this Court's venue ruling should be affirmed. The Applicant's services were beneficial because if the Applicant, on behalf of the Debtor, had not fended off the appeal, the appellants might have, on an uncontested basis, convinced an appellate court to reverse this Court's ruling—which would have then transferred venue of this case to the Western District of Texas and caused delay, and more attorneys' fees and expenses, as a new judge would have had to spend substantial time coming up to speed on all of the disputes in this case. Instead, by fighting the appeal, the Applicant, on behalf of the Debtor, made sure that venue remained in the Southern District of Texas, which paved the way for a relatively quick confirmation process. Accordingly, the Court finds that the requested fees of $5,861.50 for this category are approved.

### xx. Project Category #20: "Appeal (2004 Exam)"

The Court finds that the services rendered by the Applicant in this category were reasonable and necessary. Due to the extremely acrimonious disputes between the Debtor and the Applicant, as its counsel, and some of the Objectors, and their respective counsel, this Court issued an order regarding the method of taking 2004 examinations of various individuals. The

parties dissatisfied with this order, which included some of the Objectors—filed a notice of appeal, and therefore the Applicant, on behalf of the Debtor, had to render services as the appellee in order to make any argument at the appellate court level that this Court's 2004 examination ruling should be affirmed. The Applicant's services were beneficial because if they had not fended off the appeal, the appellants might have, on an uncontested basis, convinced an appellate court to reverse this Court's ruling—which would have resulted in more depositions and, therefore, more attorneys' fees and expenses. Instead, by fighting the appeal, the Applicant, on behalf of the Debtor, made sure that this Court's order regarding the proper method of taking the 2004 examinations was preserved, which paved the way for a global settlement through the eventual filing and confirmation of the Joint Plan. Accordingly, the Court finds that the requested fees of $1,533.00 for this category are approved.

A review of the 20 categories described in **Exhibit C** reflects that $93,132.23 should be deducted from the total fee amount requested by the Applicant.  Of this deduction of $93,132.23, **Exhibit C** reflects that this figure represents the sum of (1) $67,143.50, which equates to 246.70 hours; (2) $24,517.85, which equates to 10% of the total amount of fees requested by the Applicant relating to the "Plan and Disclosure Statements" category; (3) $825.25, which equates to 50% of the total amount of fees requested relating to the Motion for Procedures (*see* **Exhibit E**); and (4) $645.63, which equates to 11.3% of the total amount of fees requested relating to the First Interim Fee Application (*see* **Exhibit F**).

 2. <u>Whether the Amount of Time Billed on the Services Was Excessive</u>

After determining which services rendered by the Applicant were reasonable and/or necessary, this Court next determines whether the Applicant spent a reasonable amount of time rendering these services. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (stating that courts

should exclude from attorneys' fees hours that are "are excessive, redundant, or otherwise unnecessary"); *League of United Latin Am. Citizens # 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997) (noting that any hours not reasonably expended should be excluded from consideration).   The burden is on the party seeking payment of attorneys' fees to show that the hours requested are reasonable.  *Hensley*, 461 U.S. at 437; *Firth v. Don McGill of W. Houston, Ltd.*, No. Civ.A. H-04-0659, 2006 WL 846377, at *4 (S.D. Tex. Mar. 28, 2006), *aff'd sub nom. Firth v. McGill*, 233 F. App'x 346 (5th Cir. 2007).  Because this factor is listed in § 330, this Court affords it significant weight.

After reviewing the Fee Application, this Court concludes that a number of the entries contain excessive hours.  Attached hereto is a chart labeled **Exhibit H** setting forth *all* of the entries containing excessive time. The far right column of **Exhibit H** sets forth all of this Court's findings as to why the time billed is excessive. For context, set forth below is a discussion of some examples of this excessive billing.

First, the Application contains several entries reflecting excessive hours spent reviewing or drafting short documents.  For example, on June 7, 2013, Lorna Wellborn (LKW), a paraprofessional employed by the Applicant, billed 1.0 hours for "Review rule regarding emergency hearing and exhibits for hearing on June 11, 2013." [Doc. No. 831-2, p. 8 of 160]. The rule referenced, Bankruptcy Local Rule 9013-2, is only three, double-spaced pages long. The Court finds that 1.0 hours is excessive and should be reduced to 0.3 hours.  Therefore, this Court excludes 0.7 hours for this entry.

On November 10, 2013 and November 11, 2013, Mazelle Krasoff (MSK), an attorney employed by the Applicant, and Samantha Ray (SKR), a paraprofessional employed by the Applicant, billed a total of 2.8 hours for drafting and revising the Debtor's Designation of

Experts Witnesses for the Hearing on the Debtor's Amended Motion to Approve Compromise of Controversy. [Doc. No. 831-2, p. 78 of 160]. This particular pleading is only four, double-spaced pages (excluding the certificate of service). [Doc. No. 477]. Moreover, no case law is cited in the Designation. [*Id.*]. Therefore, the Court finds that 2.8 hours is excessive; further finds that only 0.5 hours should have been billed; and therefore excludes the remaining 2.3 hours. [*See* **Exhibit H**, pp. 18−20 of 104].

On December 5, 2013 and December 6, 2013, MSK and SKR spent a total of 5.0 hours drafting and reviewing the Debtor's Objection to American Equity Fund and Robert Rhodes' Motion for Leave to Amend Proofs of Claim. [Doc. No. 831-4, p. 69 of 197]. The Court finds 5.0 hours to be excessive because the objection is only eight, double-spaced pages, [*see* Doc. No. 565]; further finds that only the initiated 3.1 hours billed by MSK should have been billed; and therefore disallows the remaining 1.9 hours.

On December 4, 2013, MSK drafted twelve proposed orders—each of which was only two short paragraphs on one page—denying proofs of claim and proofs of interests. For each proposed order, MSK billed 0.3 hours; yet these orders are all very similar and were undoubtedly created through a form. This Court finds the amount of time billed for each order to be excessive and excludes 0.2 hours for each proposed order; only 0.1 hour is appropriate for each of these skeletal orders.

In fact, the Court observes a pattern in which the Applicant's professionals billed 0.3−0.5 hours for drafting, filing, or revising mundane and routine pleadings that were only a few pages long—such as certificates of service, subpoenas, notices of sworn return of service of subpoenas, and notices of hearing. By way of one example only, on November 13, 2013, SKR, a legal assistant, billed 30 minutes for drafting a notice of issuance of trial subpoenas—and yet this

notice contains *one* sentence referring the Court to the attached subpoenas.  [*See* **Exhibit H**, p. 21 of 104].  The Court finds this practice to be suspicious, and concludes that these time entries are excessive.  The Court will therefore reduce these entries to reflect appropriate amounts of time for the tasks involved, which it finds to be 0.1–0.2 hours each.

In addition to billing excessive periods of time for simple tasks, the Applicant billed excessive amounts of time working on longer and/or less routine work products.  Accordingly, the Court has also reduced entries related to preparing or filing such documents when the entries reflect an excessive amount of time spent.  For example, on December 7, 2013, MSK billed 0.6 hours for drafting a motion to strike, and then billed another 0.2 hours for reviewing and revising this motion.  [Doc. No. 831-2, p. 103 of 160].  Having reviewed this particular 3-page, double-spaced motion, this Court finds that 0.6 hours is wholly sufficient for both drafting and revising, and any additional time is excessive.  Therefore, the Court will not allow the time billed for revising this motion.  Again, on May 31, 2013 and June 3, 2013, MSK billed 1.1 hours for drafting a motion to extend the deadline to file Schedules and the Statement of Financial Affairs, billed an additional 0.6 hours to review and revise this motion, and then billed another 1.0 hours to "continue drafting" this motion.  This document is only eight, double-spaced pages long.  [*See* Doc. No. 8].  This Court therefore finds the amount of time excessive and disallows the 0.6 hours for "review[ing] and revis[ing]" and the 1.0 hours for "continue drafting."

Finally, on August 6, 2013, DCB billed 10.0 hours for "Attend hearings on Motions set for August 6, 2013."  [Doc. No. 831-2, p. 25 of 160].  However, this hearing lasted on 7.4 hours.  Therefore, this Court finds that this particular time entry is excessive and excludes 2.6 hours.

In sum, the Court finds that entries totaling 78.9 hours, for a total of $11,299.00, are excessive and should be excluded.  As already noted, **Exhibit H** sets forth all of a chart setting

forth the entries containing excessive time and this Court's findings as to why the time billed is excessive.

   3.   Summary of Disallowed Fees After Completing Step One of Lodestar Approach

   In conclusion, with respect to those services that this Court finds were neither reasonable nor necessary, it is necessary to review **Exhibits A, B,** and **C**.  **Exhibit A** sets forth all of this Court's findings as to why certain entries are vague; **Exhibit B** sets forth this Court's findings as to all of those entries that are lumped; and **Exhibit C** sets forth all of this Court's findings regarding unacceptable entries in the 20 categories described by the Applicant in the Fee Application.  **Exhibit H** then sets forth this Court's findings as to those entries containing excessive time.   The chart set forth below reflects the total hours disallowed and the corresponding fees that this Court disallows:

| | | |
|---|---|---|
| **Exhibit A:** | 42.1 hours | $13,332.50 |
| **Exhibit B:** | 211.8 hours | $58,128.00 |
| **Exhibit C:** | 246.70 hours | $67,143.50 |
| **Exhibit C:** | | $24,517.85  (10% of $245,178.50)[21] |
| **Exhibit E:** | | $825.25  (50% of $1,650.50)[22] |
| **Exhibit F:** | | $645.63  (11.3% of $5,713.50)[23] |
| **Exhibit H:** | 78.9 hours | $11,299.00 |
| | 579.5 hours | $175,891.73 |

   Thus, this Court will deduct $175,891.73 from the requested amount of fees for services of $1,155,321.50. The resulting figure of $979,429.77 represents the non-excessive fees billed by the Applicant for services that this Court finds were necessary or reasonable—or both. The first step in the lodestar method is therefore complete.

---

[21] *See supra* Part C.1.b(iv).

[22] *See id.* Part C.1.b(iii).

[23] *See id.*

**D.    Step No. 2 under the Lodestar Approach: Determining Whether the Applicant's Hourly Rates are Reasonable**

After determining which time entries are compensable, the Court now calculates the reasonable hourly fee for the services described in those entries. The Court accords this factor the same weight as the number of hours spent on compensable services.

The Court determines a reasonable hourly billing rate by evaluating the prevailing market rate in the relevant legal community. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011). At the hearing on the Fee Application, Rothberg gave testimony that the rates charged by the Applicant for its services to the Debtor have been lower than the prevailing rates in the community. [Mot. For Comp. & Reimb. Hr'g Tr. 59:15–60:16, May 27, 2014]. Rothberg did not give any testimony specifically identifying the rates of other attorneys in the community whose experience are similar to his, so this Court cannot give too much weight to this particular testimony. However, this Court may rely on its knowledge of customary billing practices in the local community to determine a reasonable rate. *Matter of Lawler*, 807 F.2d 1212 (5th Cir. 1987); *see also In re El Paso Refinery, L.P.*, 257 B.R. 809, 832 (Bankr. W.D. Tex. 2000); *In re Weaver*, No. 13–10–12204 JA, 2011 WL 867136, at *3 (Bankr. D.N.M. Mar. 11, 2011). By virtue of sitting as a bankruptcy judge in the Southern District of Texas, Houston Division, the undersigned judge is aware of the hourly rates of attorneys from other firms who appear in this District representing Chapter 11 debtors. The rates of Rothberg and Brown are very comparable to the rates of various other attorneys who represent corporate debtors in Chapter 11 cases in Houston. For example, Rothberg's hourly rate of $400 is certainly comparable to the hourly rates of Leonard Simon ($450.00),[24] Wayne Kitchens ($425.00),[25] and Matthew Probus

---

[24] *See* Doc. No. 286, p. 21, in the Chapter 11 case of *In re Las Torres Dev., LLC*, Case No 14-34883 (Bankr. S.D. Tex. 2014).

($350.00),[26] all of whom have similar legal experience to Rothberg in Chapter 11 cases. Further, Brown's hourly rate of $275.00 is very comparable to the hourly rates of Karen Emmott ($300.00),[27] William Haddock ($250.00),[28] and William Kyle Vaughn ($275.00),[29] all of whom have similar legal experience to Brown in Chapter 11 cases, particularly prosecuting and defending motions and adversary proceedings. Further, the hourly rate of the Applicant's most junior associate who provided services in this case—Mazelle Krasoff ($185.00)—compares favorably to the hourly rates of associate attorneys at other firms who represent debtors in Chapter 11 cases. In sum, the Court finds that the hourly rates of the Applicant's attorneys in this case are reasonable given the prevailing rates in the community.

Further, the Court finds that the hourly rates of the legal assistants employed by the Applicant are comparable to the rates charged by legal assistants employed at other law firms in Houston who represent Chapter 11 debtors. The hourly rates of the legal assistants employed by the Applicant are $100.00 (for SAA and LKW), $110.00 for SKR, and $130.00 for KJM. [Doc. No. 831]. These rates are very comparable to the rates of legal assistants employed by other firms who represent debtors in Chapter 11 cases having similar levels of complexity and acrimony among creditors and parties-in-interest. For example, in the Chapter 11 case of Johnson Broadcasting, Inc., the rates of the legal assistants at the law firm representing the

---

[25] See Doc. No. 18-1, p. 2, in the Chapter 11 case of *In re Village Culinary Group, LLC*, Case No. 14-32354 (Bankr. S.D. Tex. 2014).

[26] See Doc. No. 11, p. 3, in the Chapter 11 case of *In re Media Design, Inc.*, Case No. 15-30791 (Bankr. S.D. Tex. 2015).

[27] See Doc. No. 4, p. 2, in the Chapter 11 case of *In re Patrick M. Ralph*, Case No. 15-32257 (Bankr. S.D. Tex. 2015).

[28] See Claim Number 5-2, pp. 4 & 5, in the Chapter 11 case of *In re Juan Carlos Castillo*, Case No. 15-31471 (Bankr. S.D. Tex. 2015).

[29] See Doc. No. 6, p. 4, in the Chapter 11 case of *In re UPD Global Resources, Inc.*, Case No. 11-36970 (Bankr. S.D. Tex. 2011).

debtor ranged from $195.00–$230.00,[30] and in the Chapter 11 case of Las Torres Development, LLC, the rates of the legal assistants at the law firm representing the debtor ranged from $75.00 to $150.00 per hour.[31]   In sum, the Court finds that the hourly rates of the Applicant's legal assistants in this case are reasonable given the prevailing rates in the community.

Given that the hourly rates of the attorneys and legal assistants employed by the Applicant are quite comparable to the hourly rates of attorneys and legal assistants at other firms in Houston who represent Chapter 11 debtors in highly-charged cases, this Court finds that the Applicant's hourly rates are reasonable and that therefore there should be no adjustment—either upward or downward—in the total lodestar fee.

Thus, the total lodestar fee is $979,429.77, which is derived as follows:

| | |
|---|---|
| Amount Requested by the Applicant for Services Rendered: | $1,155,321.50 |
| (Less) | - |
| (1) amount deducted for vague entries (**Exhibit A**): | $13,332.50 |
| (2) amount deducted for lumped entries (**Exhibit B**): | $58,128.00 |
| (3) amount deducted for services that were neither necessary nor reasonable (**Exhibit C**): | $93,132.23 |
| (4) amount deducted for excessive time (**Exhibit H**): | $11,299.00 |
| | $979,429.77 |

## E.   Adjusting the Lodestar Fee

This Court, in its discretion, may consider whether the lodestar fee of $979,429.77 should be adjusted upward or downward to account for factors not considered during the lodestar calculation.  *Pilgrim's Pride*, 690 F.3d at 655.  In assessing whether to make an adjustment, the Court may consider, among other factors, the twelve factors articulated in *Johnson*: "(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due

---

[30] *See* Doc. No. 157, p. 10 & Doc. No. 797, p. 16, in the Chapter 11 case of *In re Johnson Broadcasting, Inc.*, Case No. 08-36583 (Bankr. S.D. Tex. 2008).

[31] *See* Doc. No. 286, p. 21, in the Chapter 11 case of *Las Torres Development, LLC*, Case No. 14-34883 (Bankr. S.D. Tex. 2014).

to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases." *Johnson*, 488 F.2d at 716.

1. Applying the Twelve *Johnson* Factors Results in No Adjustment to the Lodestar Fee

In applying each of the twelve factors, this Court concludes that several of the factors were already subsumed in its calculation of the lodestar fee. First, in evaluating the number of hours the Applicant reasonably expended in the main case and in various adversary proceedings, the Court has considered the novelty and difficulty of the questions presented, the time and labor required to complete necessary task, and the skill needed to perform the legal services properly. The Court acknowledges that some of the issues which the Applicant confronted involved relatively complex questions of law, and that a certain level of skill and expertise in bankruptcy and corporate law was required to represent the estate. Even considering this relative complexity, the Court has found a certain amount of inappropriate billing in the fee statements that—as discussed in detail above and on **Exhibits A**, **B**, **D** and **H**—warrants a decrease in the number of hours reasonably expended by the Applicant. Additionally, in evaluating the reasonableness of hourly rates billed in the fee statements, the Court has considered whether the professionals and legal assistants employed by the Applicant have charged a customary fee, and has also examined the relative experience, reputation, and ability of the attorneys and legal assistants involved. Thus, the Court will not adjust the lodestar fee of $979,429.77 either upwards or downwards based upon further consideration of these *Johnson* factors. *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006) ("The lodestar may not be adjusted due to a *Johnson*

factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.").

Further, the Court concludes that a number of the *Johnson* factors are not relevant to an evaluation of the reasonableness of attorneys' fees in this case. Indeed, certain factors—such as preclusion of other employment due to acceptance of the case, whether the case involves a fixed or contingent fee, the time limitations imposed by the client or other circumstances, the "undesirability" of the case, and the nature or length of the professional relationship with the client—are factors which bear more relevance in a fee-shifting case. *In re El Paso Refinery, L.P.,* 257 B.R. 809, 826 (Bankr. W.D. Tex. 2000). Typically, preclusion of employment presumes that an attorney does not generally engage in the sort of representation for which fees are being requested and, therefore, is prevented from undertaking a customary amount of additional work due to the increased time demand of that particular case. *See id.* at 826, n. 30. The professionals involved in the case at bar, and in the adversary proceedings associated therewith, may have been precluded from representing other clients, but such preclusion is simply due to the natural limitations on billable hours, as the fees sought by the Applicant are fixed per hour, rather than on a contingency fee basis. Consideration of the time limitations imposed by the client or other circumstances likewise does not add to the analysis, as similar limitations are present in all bankruptcy related representations.

While this Court notes that litigating the various issues presented in this case and the numerous adversary proceedings could certainly be construed as less than desirable, the relative "undesirability" of a bankruptcy case or related adversary proceeding arguably does not have the same effect as in contingency fee cases. Nevertheless, the Court does not find cause to adjust the Applicant's fees based on the "undesirability" of this case or any adversary proceeding

associated therewith.  Further, the length of the professional relationship between counsel and clients rarely affects the nature of the fees requested in a bankruptcy context, especially since a substantial pre-bankruptcy relationship may disqualify attorneys from representation of the debtor.

Finally, in calculating the lodestar fee in this case, the Court has taken into consideration the results that the Applicant obtained.  In some instances, the Court has awarded all of the fees requested by the Applicant due to the results obtained—for example, the litigation involving the Debtor and Oleum Capital.  [*See supra* Part C.1.b(xi)].  Conversely, in other instances, the Court has reduced the fees—for example, the Court has denied the fees associated with the Applicant's attempts, on behalf of the Debtor, to obtain post-petition financing because of the woeful efforts by the Applicant to adduce testimony to satisfy the Debtor's burden to obtain the financing.  [*See supra* Part C.1.b(ix)].  Thus, having already considered the results obtained in arriving at the lodestar fee, the Court finds that no further adjustment, upward or downward, should be made. *Saizan*, 448 F.3d at 800 ("The lodestar may not be adjusted due to a *Johnson* factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.").

2.  Consideration of "All Other Relevant Equitable Factors" in this Case Results in Further Reduction of the Lodestar Fee

Aside from adjusting the lodestar fee based upon the twlve *Johnson* factors, this Court may consider other factors as well.  In his concurring opinion in *Woerner*, Judge Grady Jolly contextualized this broad discretion within the new framework:

(1) a court is permitted, but not required, to award fees under § 330 for services that could reasonably be expected to provide an identifiable, material benefit to the estate at the time those services were performed (or contributed to the administration of the estate); and (2) **courts may consider all other relevant**

68

**equitable factors**, as stated in § 330(a)(3), including as one of those factors, when appropriate, whether a professional service contributes to a successful outcome.

783 F.3d at 278 (Jolly, J., concurring) (emphasis added). Further, though Judge Prado's majority opinion in *Woerner* clarifies that bankruptcy courts *may* award compensation for failed efforts as long as the efforts were reasonable, it "is not intended to limit courts' broad discretion" to consider "all relevant factors," including the ultimate outcome of the case. 783 F.3d at 277. In the case at bar, this Court now exercises its discretion to "consider all other relevant factors," and in doing so, finds that further reduction of the lodestar fee is appropriate for three reasons.

> a. *Reason Number One for Reducing the Lodestar Fee: The Applicant's Failure to Completely Disclose Its Relationship with Herrera*

In its application to represent the estate in this Chapter 11 case, [Doc. No. 6], the Applicant failed to disclose that in 2011, in a different Chapter 11 case, Rothberg had represented Herrera in an appeal of one of this Court's orders. [*See* Notice of Appeal filed by Gilbert A. Herrera and Herrera Partners, Doc. No. 288, Case No. 10-37503, *In re IRH Vintage Park Partners, L.P.*]. The Applicant was required to disclose this prior attorney-client relationship. *See Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994) ("[A]s soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict, . . . , a bankruptcy court ruling should be obtained."). In the Fifth Circuit, failure to make required disclosures to a bankruptcy court can be grounds for total denial of a fee application. *In re W. Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005); *see also In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012) ("Courts may deny all compensation to professionals who fail to make adequate disclosure"). Indeed, in *Delta Oil*, the Fifth Circuit denied all fees after finding that the professional failed to disclose an interest that would have been disqualifying. 432 F.3d at 357–58. In *Am. Int'l Refinery*, the Fifth Circuit affirmed a fee reduction of 20% even though it

found the interest would not have been disqualifying.  676 F.3d at 465–66.  In that case, the debtor's counsel failed to disclose that its initial retainer was paid by one of the debtor's largest creditors.

Here, Rothberg initially testified that he did not recall any previous representation of Herrera.  [Hr'g Tr. 57:12–24, Aug. 28, 2014].  Later, he testified that he had in fact represented Herrera.  [*Id.* at 77:15–79:15].[32]  This Court finds that the Applicant's failure to disclose its relationship to Herrera is related to the limited success of the Debtor's case, because this relationship led—at least in part—to the employment of an investment banker (i.e., Herrera) whose services were woeful and did not come within hailing distance of providing the benefit to the estate that both Smith and Herrera testified initially could be provided (i.e., selling the subsidiaries for sufficient proceeds to pay all creditors in full).  *See In re Digerati Technologies, Inc.*, 524 B.R. 666 (Bankr. S.D. Tex. 2015) (describing Herrera's substandard efforts and denying in its entirety Herrera's fee application request of $483,971.81).

This Court weighs heavily both the Applicant's failure to disclose, a transgression the Fifth Circuit treats seriously, and the ultimate outcome of the case.  However, the Court finds that the Applicant's failure to disclose was not as egregious as the failure to disclose in *Am. Int'l*

---

[32] There is no question that Rothberg had represented Herrera in an appeal of one of the undersigned judge's orders in a Chapter 11 case known as *In re IRH Vintage Park Partners*, Case No. 10-37503. Specifically, this Court denied a fee application of Herrera. [Case No. 10-37503, Doc. No. 285]. Rothberg filed the Notice of Appeal on September 19, 2011. [Case No. 10-37503, Doc. No. 288]. To the extent that the Applicant suggests that it did not need to disclose this representation because the *IRH Vintage Park Partners* case was assigned to the undersigned judge, the Applicant is wide off the mark for two reasons. First, this Court did not recollect Rothberg's prior legal representation of Herrera in this particular appeal. Indeed, the undersigned judge does not keep tabs on who is representing parties who are appealing orders from this Court; and if it had recollected Rothberg's representation, it would have further explored this relationship at the hearing in this case on the Debtor's application to employ Herrera before deciding on whether to allow the Debtor to employ Herrera. Second, even if this Court did know of this past legal representation, the Applicant is not excused from its duty to make the disclosure to all creditors and parties-in- interest in this case, as they were not involved in the *IRH Vintage Park Partners* case in which Rothberg represented Herrera on appeal; and had the creditors and parties-in-interest in this case known of this prior attorney-client relationship, they would have had the opportunity to argue that this Court should not approve the Debtor's retention of Herrera on the grounds that there was an unacceptable conflict of interest. If they had been given such an opportunity, they might well have convinced this Court not to approve Herrera. The Applicant's failure to disclose the Rothberg/Herrera prior attorney-client relationship, however, precluded any creditor or party-in-interest from having such an opportunity.

*Refinery*, and notes that this pending Chapter 11 case did at least result in a fairly successful reorganization, with a 100% payout to unsecured creditors, if not to secured creditors. Therefore, the Court finds that it is appropriate to impose a 5% fee reduction for the Applicant's failure to disclose its prior representation of Herrera. Five percent of the total fees that the Applicant requested, not counting fees for preparation of the Fee Application, amounts to $57,766.08 (i.e., $1,155,321.50 x .05).

> **b.  Reason Number Two for Reducing the Lodestar Fee: The Applicant Slavishly Looked Out for the Individual Interests of Smith and Estrada to the Detriment of the Estate's Interests**

This is not the only reduction to be made due to relationships. This Court finds that another of the Applicant's relationships damaged the estate—its overly cozy relationship with the two officers of the Debtor, Smith and Estrada. There is no question that the Applicant was aware at the outset of this case of the bitter dispute between the Objectors (some of whom believed that they constituted the proper board), on the one hand, and Smith and Estrada, on the other hand. And, there is no question that from the outset, the Applicant was aware that the Objectors would actively participate in this case. Under these circumstances, the Applicant's vigorous prosecution of a plan of reorganization that kept Smith and Estrada as the *sole* officers and *sole* directors of the Debtor with excessive compensation packages was patently unconfirmable.[33]

---

[33] In its order denying confirmation of the Plan, this Court, in giving its reasons for denying confirmation, made the following observations: "Article 9.1 of the Plan sets forth that the Debtor assumes the executory contracts set forth in exhibit 5 attached to the Plan. [Doc. No. 732, p. 43 of 131]. A review of Exhibit 5 reflects that the Debtor intends to assume employment agreements with Smith and Estrada. [Doc. No. 732, p. 128 of 131]. Indeed, Smith testified about his employment agreement at the confirmation hearing. It is—to put it mildly—a very rich deal for Smith. Section 6(a)(iii) allows Smith for "good reason" to terminate his employment under a variety of circumstances, many of which are circumstances he would control as an officer and director of the Debtor. And, by his own testimony, if his employment was terminated, he would be entitled to receive compensation in the range of $700,000 - $1.2 million. This package is unreasonable given that Smith will be the officer and director of a holding company which will own the stock of one fairly small and fledging company named Shift 8." [Doc. No. 739, p. 8 of 11]. The Court also notes that early on in the case, it had already expressed its concern to the Applicant on just exactly what services Smith and Estrada were providing to the estate. [Doc. No. 63, p. 8 of 9] ("Given the Debtor's use of all of

71

The Applicant's approach in filing and prosecuting the Plan can only be explained by its slavish desire to benefit Smith and Estrada, individually. Indeed, the Applicant's attempt to foist Smith and Estrada on the creditors and stockholders of the Debtor was particularly galling because, as this Court noted in its order denying confirmation of the Plan, "Smith does not understand many provisions of the Plan. Indeed, at one point during the hearing when Smith was unable to answer a question about a provision of the Plan, one of the attorneys representing the Debtor, Ed Rothberg, informed the Court that he (i.e., Rothberg) had listed himself as a witness so that he could give testimony about the Plan's meaning and implementation." [Doc. No. 739, p. 9 of 11]. Thus, the Applicant, in drafting and prosecuting the Plan, not only wanted the creditors and shareholders to swallow absurdly high compensation packages for Smith and Estrada while allowing them to be the sole officers and directors of the Reorganized Debtor; the Applicant wanted them to do so despite their fundamental lack of understanding of the Plan provisions. Stated differently, the Applicant wanted the creditors and shareholders of the Debtor to reward incompetence. If this is not elevating the interests of Smith and Estrada above the interests of the estate, then nothing is.

The Applicant's insistence on promoting this unrealistic, arrogant plan for the benefit of Smith and Estrada wasted time that could have been spent prosecuting a feasible plan and also fomented further mistrust with the other parties-in-interest and their attorneys. Indeed, after this Court denied confirmation of the Debtor's Plan, the attorney for the major secured creditors (i.e., the Dishon and the Hurley families) had to take the laboring oar to obtain confirmation of the Joint Plan. [Finding of Fact No. 25]. This Court finds that the Applicant's prosecution of the

---

these professionals, the Court wants to know: (1) what exactly is Smith going to do eight hours per day for the estate?; (2) what exactly is Estrada going to do eight hours per day for the estate?"); [Doc. No. 156, p. 2 of 12] ("An additional reason for denial of the Motion is that the Debtor has failed to convince this Court that the Debtor needs the services of both Smith and Estrada, with each receiving $5,000.00 per month.").

Plan placed the individual interests of Smith and Estrada above the interests of the Debtor's estate, and therefore that the Applicant ceased to be "disinterested" during this period. The Court has not accounted for this particular damage and wasted time in its modest reduction of fees totaling $24,517.85 for services related to the Plan that the Applicant unsuccessfully attempted to confirm. [*See supra* Part C.1.b(iv)]. Under these circumstances, the Court finds that a reduction in the Applicant's fees is appropriate. *See In re Kendavis Industries Int'l, Inc.,* 91 B.R. 742, 754 (Bankr. N.D. Tex. 1988) ("An attorney who claims to represent a partnership, but also has some agreement, whether express or implied, with the general or limited partners, or with any control person, to protect its interest, that attorney has an actual conflict of interest, and is subject to disqualification and a disallowance of fees."); *In re Liberty Trust Co.,* 92 B.R. 706, 707 (Bankr. W.D. Tex. 1988) ("[W]hen the attorneys for the debtor [corporation] begin to represent the debtor's principal, they may not be compensated because they are not disinterested parties."). The Court will therefore deduct an additional 5% for the Applicant's failure to remain disinterested. Five percent of the total fees that the Applicant has requested, not counting fees for preparation of the Fee Application, amounts to $57,766.08 (i.e., $1,155,321.50 x .05).

   c. *Reason Number Three for Reducing the Lodestar Fee: The Applicant's Employment of Unsavory Litigation Tactics*

   Finally, this Court finds that a further reduction should be made due to an unacceptable litigation tactic that the Applicant has employed. After the record was closed, but prior to the date for closing arguments to be made, the Applicant filed a pleading entitled: Hoover Slovacek, LLP's Supplement and Notice Related to Its Final Fee Application and Its Objection to the Rule 52 Motion(s) (the "Supplement"). [Doc. No. 1127]. The first section of the Supplement is entirely appropriate because it informed the Court that the Fifth Circuit had recently issued the

*Woerner* opinion reversing the standards set forth in *Pro-Snax*. Counsel certainly owes a duty to bring to the Court's attention any change in the law applicable to the dispute at bar.

The second section of the Supplement, however, is entirely inappropriate. This section is entitled "Robert Rhodes." Rhodes is one of the Objectors, and there is no question that he has been at serious odds with the Debtor and its two officers, Smith and Estrada. The Supplement contains the following paragraph, among others, about Rhodes:

> Mr. Rhodes was arrested in Sugarland, Texas. He has surrendered his passport and posted bond of $10,000. [*See* Ex. B to the Supplement]. The State of Iowa asked for a bond of $500,000 alleging Mr. Rhodes was a flight risk. According to the Court's docket, an extradition hearing is set for May 7, 2015. [*See* Ex. C to the Supplement], Criminal Case Reset Form. The actions complained of in the Complaint pre-date the November 2012 Transaction.

Informing the Court about Rhodes's arrest, plus attaching exhibits about the background of the arrest, is blatantly beyond the scope of the authorized briefing. At the last evidentiary hearing on the Fee Application, the Applicant requested time to order transcripts and to submit "briefs and citations to transcript evidence as part of a closing." [Hr'g Tr. 115:21–25, Jan. 30, 2015]. The Court granted the parties leave to "get transcripts and make argument based on the transcripts." [*Id.* at 145:11–15]. The Court did *not* grant the parties leave to submit new evidence after the parties had both rested on January 30, 2015. Exhibits B and C attached to the Supplement—are exactly that: new evidence—and this Court will not now consider it. *See Hansen v. Schubert*, No. CIV W-02-0850 FCD GG, 2007 WL 1029812, at *2 (E.D. Cal. Apr. 2, 2007) (The court's direction for supplemental briefing was not an invitation for plaintiffs to take a second bite at the apple in bringing new evidence to the court's attention . . . .").

In *Woerner*, the Fifth Circuit directs bankruptcy courts to consider "all other relevant factors" in assessing whether fees should be adjusted. *Woerner*, 783 F.3d at 277 (citing § 330).

Here, the portion of the Supplement on Robert Rhodes cited above is both frivolous and in bad faith, and this Court finds that this "Rambo" conduct merits a reduction in the lodestar fee.

Even if this Court had granted the Applicant leave to submit new evidence, the evidence submitted in the Supplement would have been irrelevant to the issues before the Court. The arrest of Robert Rhodes has absolutely nothing to do with the Fee Application. Because the Supplement provides no explanation of the relevance of Rhodes's arrest to the dispute at bar, the Court necessarily concludes that the Applicant hopes the Court will consider the Objection less credible in general because Rhodes is one of the Objectors. The Court does not recognize this connection and finds the evidence irrelevant.

Furthermore, the evidence is impermissible under Federal Rules of Evidence 404, which generally bars evidence of a crime or other bad act to prove a person's character on a particular occasion. Because the dispute at bar is simply not a criminal proceeding in which Rhodes is a defendant, there is no possibility of an exception to this rule, unless Rhodes was a witness at the Fee Application hearing—which he was not. *United States v. Farias*, 925 F.2d 805, 811 (1991) ("The fact that Rule 608(b) by its terms refers to prior conduct specifically 'of a *witness*, for the purpose of attacking or supporting the *witness' credibility'* reflects that the rule is not intended broadly to restrict the introduction of exculpating or incriminating substantive evidence.").

Finally, assuming arguendo that Rhodes's arrest is somehow relevant to the dispute at bar, Federal Rule of Evidence 403 allows this Court, in its discretion, to exclude such evidence if its probative value is substantially outweighed by, among other things, unfair prejudice and confusing the issues. Here, the Supplement constitutes unfair prejudice because the Applicant submitted it to this Court long after the record had been closed. Moreover, the Supplement confuses the issues, as the Applicant attempts to cast aspersions on Rhodes—who is only one of

the many Objectors—in order to mask the infirmities of the Fee Application, all of which are discussed in this Opinion.

In sum, the Supplement represents nothing more than the Applicant's improper attempt to prejudice this Court against Rhodes in particular and the Objectors in general. This "Rambo" litigation tactic will not work. The Court finds that the second section of the Supplement is frivolous, and the Applicant's attempt to cast aspersions on Rhodes's character—and, by implication, all of the Objectors—is in bad faith. The Court will therefore impose an additional reduction of the total fees that the Applicant has requested, not counting fees for preparation of the Fee Application.

The Court finds that the reduction should not be as great as the 5% reductions that the Court has imposed for the Applicant's failure to disclose its prior representation of Herrera and for the Applicant's lack of disinterestedness with respect to promoting the personal interests of Smith and Estrada when prosecuting the Plan. The Court takes this view because the failure to disclose its past attorney-client relationship with Herrera and its lack of disinterestedness with respect to Smith and Estrada occurred pre-confirmation and clearly these circumstances had a deleterious effect on the plan confirmation process—i.e., it took longer to confirm a plan (i.e., the Joint Plan) then would otherwise have been the case. Conversely, the "Rambo" tactics concerning Rhodes occurred long after confirmation of the Joint Plan, so this unseemly litigation strategy did not undermine or delay the key objective of any Chapter 11 case: namely, to obtain confirmation of a plan. Nevertheless, the tactic is not only a "cheap shot" at Rhodes in particular, but an abject disregard of and lack of respect for the rules that govern the adversarial process. Under these circumstances, the Court finds that a reduction of 2.5% of the total fees requested by the Applicant is appropriate. This percentage is one-half of the percentage

reduction that this Court made with respect to the Applicant's failure to disclose its relationship with Herrera and its disinterestedness with respect to Smith and Estrada.

Accordingly, the reduction will be in the amount of $28,883.04 (i.e., $1,155,321.50 x .025).

### d.  Summary of Reductions to the Lodestar Fee

In sum, pursuant to *Woerner*'s directive that this Court may exercise "broad discretion" to "consider all relevant factors," this Court finds that further reductions to the lodestar fee totaling $144,415.20 is appropriate due to: (a) failure to disclose that the Applicant had served as counsel of record for Herrera in an appeal in a prior case; (b) slavishly looking out for the individual interests of Smith and Estrada when these interests were not beneficial to the estate; and (c) employing "Rambo" litigation tactics by attempting to introduce prejudicial evidence long after the record had been closed and without obtaining leave of this Court. The amount of the reduction is the sum of $57,766.08 plus $57,766.08 plus $28,883.04—which totals $144,415.20.  Thus, the lodestar fee of $979,429.77 is reduced by $144,415.20, resulting in approved fees of $835,014.57.

## F.    Whether the Expenses Requested are Reasonable

The Applicant has requested a total of $97,406.66 in reimbursable expenses.  [Doc. No. 831, Exhibit F].  The Court finds that, with two significant exceptions, the expenses for which reimbursement is requested are reasonable.

First, the Court finds that the Applicant's request for $5,962.01 for "Lexis-Nexis Online Research" is not reasonable.  Online legal research is a cost that is reflected in an attorney's billing rate and is therefore subsumed into attorneys' fees.  *See Embotelladora Agral Regiomontana, S.A. de C.V. v. Sharp Capital, Inc.*, 952 F. Supp. 415, 418 (N.D. Tex. 1997).  As the Seventh Circuit explained:

> The added cost of computerized research is normally matched with a corresponding reduction in the amount of time an attorney must spend researching. Therefore, we see no difference between a situation where an attorney researches manually and bills only the time spent and a situation where the attorney does the research on a computer and bills for both the time and the computer fee. In both cases the total costs are attorney's fees and may not be recovered as "costs."

*Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 38 F.3d 1429, 1440–41 (7th Cir. 1994). Therefore, the Lexis-Nexis fees the Applicant requests are already factored into the hourly rates of the professionals employed by the Applicant. To award these fees as reimbursable expenses would therefore represent double-counting, which is unreasonable. The Court consequently denies all $5,962.01 for the requested "Lexis-Nexis Online Research."

Second, the Court finds that the Applicant's request for $59,595.43 for "Outside Copy Charges" is not reasonable. The Applicant bears the burden of establishing what the requested expenses paid for and why they were necessary to the work performed. *See Fogleman v. ARAMCO (Arabian Am. Oil Co.)*, 920 F.2d 278, 286 (5th Cir. 1991) ("[R]eproductions necessarily obtained for use in the case are included within taxable costs, provided that the prevailing party demonstrates that necessity."). The Applicant has failed to provide the barest modicum of detail regarding this notably high cost of "Outside Copy Charges." [Doc. No. 831-6, p. 1 of 15]. By contrast, for the "Digital Copies," the Applicant provided the number of copies and the cost per page. [*Id.*]. The Court finds that at the very least, this level of detail is required to justify reimbursement for such a high cost for copy charges. Nor did the Applicant provide any testimony or introduce any exhibits at the Fee Application hearing on this particular expense. *First State Bancorporation*, 2014 WL 1203141, at *37 ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation."); *Advanced Microbial Solutions*, 306 B.R. at 920. Consequently, the Applicant has failed to meet

its burden of proof of establishing that the "Outside Copy Charges" of $59,595.43 are reasonable, and therefore reimbursable. Thus, the Court will deny all $59,595.43 requested in this category.

Other than these two categories of disallowed expenses, the Court has reviewed the one-page list of expenses, [Doc. No. 831-6, p. 1 of 15], and finds that they are reasonable. Specifically, the Court finds that the Applicant should receive reimbursement for following out-of-pocket expenses:

| | |
|---|---|
| Certified Copies: | $712.25 |
| Conference Call: | $522.54 |
| Court Copies: | $1,285.95 |
| Deposition Transcripts: | $5,109.35 |
| Digital Copies: | $22.60 |
| Document Retrieval: | $91.27 |
| Federal Express: | $1,516.53 |
| Filing Fees: | $2,480.73 |
| Delivery Service: | $2,850.95 |
| Local Parking: | $854.50 |
| OT Air Conditioning: | $1,100.00 |
| Outgoing Fax Charge: | $75.25 |
| Pacer Research Fees: | $1,985.70 |
| Photocopy Expenses: | $5,730.30 |
| Postage: | $632.08 |
| Record Search: | $68.00 |
| Research Fee Secretary of State: | $544.00 |
| Service Fees: | $4,226.15 |
| Travel Out of Town: | $1,089.87 |
| Trial/Hearing Transcripts: | $951.20 |

In sum, the Court will allow $31,849.22 and deny $65,557.44 of the requested $97,406.66 in expenses.

## G.   Whether the Amount Requested for Preparing the Fee Application is Reasonable

Finally, the Court turns to whether the Applicant is entitled to the $10,000.00 it has requested for preparing the Fee Application. Although the Supreme Court has determined that

bankruptcy professionals are not entitled to compensation for *defending* a fee application, they are entitled to reasonable fees and expenses incurred in simply *preparing* a fee application. *Baker Botts, L.L.P. v. ASARCO, L.L.C.*, 135 S. Ct. 2158, 2167 (2015) ("Section 330(a)(1) . . . authorize[s] . . . 'reasonable compensation for actual, necessary services rendered by' the § 327(a) professional . . . . A § 327(a) professional's preparation of a fee application is best understood as a 'servic[e] rendered' to the estate administrator under § 330(a)(1), whereas a professional's defense of that application is not."); *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir. 1980). While the Fifth Circuit has not set a definitive cap on what is considered reasonable for preparation of a fee application, many courts limit such awards to 5% of the total amount requested in a fee application. *See, e.g.*, *In re Mesa Air Grp., Inc.*, 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011); *In re New Boston Coke Corp.*, 299 B.R. 432, 446 (Bankr. E.D. Mich. 2003). In *Rose Pass Mines*, the Fifth Circuit reversed an award of $3,850.00 for a $59,000.00 fee application, representing approximately 6%. Here, the $10,000.00 that the Applicant has requested for preparing the Fee Application represents less than 1% of the amount requested for the services rendered to the Debtor. Further, it represents only 1.14% of the amount of fees and expenses this Court is actually awarding the Applicant. This Court therefore finds that the $10,000.00 in fees and expenses that the Applicant has requested for preparing the Fee Application is reasonable, and allows this amount in full.

## V. CONCLUSION

The level of vitriol between the Objectors and their attorneys, on the one hand, and the Debtor (including its officers, Smith and Estrada) and the Applicant, on the other hand, has been—and continues to be—extremely high. Indeed, the Applicant's recent outside-of-the-record reference to Rhodes's arrest underscores the continuing level of disdain among the parties. The Objectors, to a certain degree, perhaps goaded the Applicant into making imprudent, strategic calls—such as filing the arrogant Plan that was patently unconfirmable. But, even if goaded, the Applicant, on behalf of the Debtor, inadvisably spent time prosecuting this Plan, and taking other ill-advised actions—such as trying to obtain post-petition financing without coming within hailing distance of adducing testimony to meet the necessary burden under § 364 or attempting to obtain "sweetheart" compensation packages for Smith and Estrada. Now, the Applicant must suffer the consequences of its actions by having its requested fees reduced due to these poorly conceived and executed efforts. Moreover, the Applicant must suffer the consequences of questionable internal billing practices: namely, lumping as well as entering standardized amounts of time for certain mundane services when the amount of time is patently excessive. Finally, the Applicant must suffer the consequences of failing to adduce sufficient testimony at the hearing on the Fee Application. As the discussion of various time entries in this Opinion illustrates, the Applicant simply failed to make a record sufficient to meet its burden so that this Court could make a finding that the services described by the various time entries were either necessary or reasonable.

The Applicant has requested total fees of $1,155,321.50 (not including the $10,000.00 fee request for preparing the Fee Application). As set forth in this Opinion, the Court disallows the following amounts relating to the following categories:

- Vague Time Entries (**Exhibit A**):                          $13,332.50
- Lumped Time Entries (**Exhibit B**):                     $58,128.00
- General/Miscellaneous (**Exhibit D**, pp. 1-28):      $8,098.50
- Schedules, SOFA, 341 Meeting, MORs (**Exhibit D**, pp. 29-59):    $7,038.00
- Professionals (**Exhibit D**, pp. 60-121):             $9,137.00
- Plan and Disclosure Statements (**Ex. G**; *see supra* **Part C.1.b(iv)**): $29,861.35
- Asset Disposition (**Exhibit D**, pp. 122–124):          $842.50
- Claims (**Exhibit D**, pp. 125–139):              $3,337.50
- DIP Financing (**Exhibit D**, pp. 140–273):         $29,585.50
- Digerati v. Sonfield Litigation (**Exhibit D**, pp. 274–280):    $1,374.00
- Sonfield v. Albeck Litigation (**Exhibit D**, pp. 281–287):     $549.00
- Recap Marketing v. Jaclin Litigation (*see supra* **Part C.1.b(xiv)**): $1,673.00
- Arrayit (*see supra* **Part C.1.b(xvi)**):                  $165.00
- Entries Related to the Motion for Procedures (**Exhibit E**)    $825.25
- Entries Related to the First Interim Fee App (**Exhibit F**)     $645.63
- Excessive Time Billed (**Exhibit H**):              $11,299.00
- Failure to Disclose Herrera Representation:         $57,766.08
- Placing the Personal Interests of Smith and Estrada Above the Interests of the Estate:            $57,766.08
- Improperly Attempting to Prejudice this Court Against Rhodes by Attaching to the Supplement Certain Documents Regarding his Arrest that are Outside of the Record:     $28,883.04

The sum of the above-referenced figures equals $320,306.93, and it is this amount that the Court disallows. Subtracting $320,306.93 from $1,155,321.50 results in $835,014.57 and it is this amount of fees that this Court approves for the services rendered on behalf of the estate in this Chapter 11 case.

The Court also approves the entire $10,000.00 requested by the Applicant for preparing the Fee Application.

The Applicant has also requested reimbursement of expenses totaling $97,406.66. As set forth in this Opinion, the Court disallows the amount of $5,967.01 for "Nexus-Lexus Online Research" and $59,595.43 for "Outside Copy Charges." Thus, the total amount of expenses that this Court disallows is $65,557.44. Subtracting $65,557.44 from $97,406.66 results in $31,849.22, and it is this amount of reimbursable expenses that this Court approves.

The Applicant requests an aggregate amount of $1,262,728.16.[34] This Court, however, will not award this entire amount. As set forth above, the Court allows $835,014.57 in fees for services rendered on behalf of the estate and denies $320,306.93 in fees; allows $31,849.22 in expenses and denies $65,557.44 in expenses; and allows all $10,000.00 for preparation of the Fee Application. The sum of $835,014.57 plus $31,849.22 plus $10,000.00 amounts to a **total award of $876,863.79**. As noted, the Applicant has already received $421,921.48, [Findings of Fact Nos. 10 & 13], so the Court is now authorizing a disbursement of $454,942.31.

A separate order consistent with this Opinion will be entered simultaneously on the docket.

Signed this 21st day of August, 2015.

_____
Jeff Bohm
United States Bankruptcy Judge

---

[34] As set forth in the Introduction, the aggregate amount requested of $1,262,728.16 is the sum of $1,155,321.50 of fees for services rendered + $10,000.00 of fees to prepare the Fee Application + $97,406.66 of reimbursable expenses.